[Civ. No. 22508. First Dist., Div. One. Sept. 7, 1966.]

CORONET CREDIT CORPORATION, Plaintiff, Cross-defendant and Appellant, v. WEST THRIFT COMPANY et al., Defendants, Cross-defendants and Respondents; NORTHERN CALIFORNIA FINANCE COMPANY, Defendant, Cross-complainant and Respondent; LESLIE B. COHN et al., Cross-complainants and Appellants.

632

Yale H. Smulyan, Field, DeGoff & Rieman and Sidney F. DeGoff for Plaintiff, Cross-defendant and Appellant, and for Cross-complainants and Appellants.

Gross, Gross, Rose & Schwartz and Harry M. Gross for Defendants, Cross-defendants and Respondents, and for Defendant, Cross-complainant and Respondent.

MOLINARI, J.—This is an appeal by Coronet Credit Corporation and Leslie and Ethel Cohn from the judgment entered against them and in favor of West Thrift Company, Northern California Finance Company, Harry Gross, and Leonard Gross, which judgment adjudged (1) that Coronet was entitled to no relief against West Thrift, Northern California Finance, Harry Gross, and Leonard Gross on its complaint which sought (a) declaratory relief to the effect that Coronet had fully discharged its obligations under its contract with West Thrift involving the purchase by Coronet of certain of West Thrift's accounts, (b) return of all interest and consideration paid by Coronet to West Thrift over and above the $16,500 principal of an allegedly usurious loan, plus treble damages for the interest and consideration paid to West Thrift within one year preceding the commencement of the action, and (c) damages for West Thrift's alleged breach of a contract to lend Coronet $40,000; and (2) that Northern California Finance have judgment in the amount of $23,141.78 plus interest and $2,500 attorneys' fees against Coronet and Leslie and Ethel Cohn on its cross-complaint, which cross-complaint sought recovery of the sum of $24,500 together with attorneys' fees in the amount of $3,000 against Coronet and Leslie and Ethel Cohn upon a written guaranty allegedly executed by them[1] in favor of West Thrift and allegedly assigned by West Thrift to Northern California Finance.[2]

[1] Although the subject guaranty recites that the borrowers were Coronet and Leslie and Ethel Cohn, it was only signed by the Cohns individually. However no contention is made by appellants on this appeal that Coronet was not obligated under said guaranty.

[2] The judgment as it stands fails to mention or dispose of the cross-complaint filed by Coronet and Leslie and Ethel Cohn against West Thrift, Northern California Finance, Harry Gross, and Leonard Gross. As to this cross-complaint, which in essence sought reformation of the guaranty, the trial court, in its minute order for judgment, ordered that judgment be entered for cross-defendants. Although the judgment appealed from in the instant case is not final because of its failure to dispose of this cross-complaint, we do not deem it desirable to dismiss the appeal on this basis; rather, under the authority of *Gombos* v. *Ashe*, 158 Cal.App.2d 517, 524 [322 P.2d 933]; *Tsarnas* v. *Bailey*, 179 Cal. App.2d 332, 337 [3 Cal.Rptr. 629]; and *Shepardson* v. *McLellan*, 59 Cal. 2d 83, 89 [27 Cal.Rptr. 884, 378 P.2d 108], we amend the judgment by including therein an order that cross-complainants Coronet Credit Corporation, Leslie Cohn and Ethel Cohn are entitled to no relief on their cross-complaint against cross-defendants West Thrift Company, Northern California Finance Company, Harry Gross and Leonard Gross.

Although we will discuss appellants' contentions in detail below, at this point we state their contentions generally as follows: (1) The findings which the trial court made concerning the obligations of Coronet and West Thrift under the April 24, 1962 agreement relating to the sale of accounts are erroneous and incomplete in several respects, and particularly in regard to Coronet's right to reassign certain accounts to West Thrift for credit; and (2) the $16,500 loan which West Thrift made to Coronet violated the provisions of the Financial Code relating to the maximum allowable charges which an industrial loan company may assess in making a loan and the trial court failed to make findings necessary to support its determination that the loan did not violate these provisions of the Financial Code.

## The Facts

Leslie and Ethel Cohn were the sole stockholders of Coronet, a corporation whose business involved the purchasing of accounts receivable, and Harry Gross was president and a director of West Thrift, an industrial loan company. On April 24, 1962, following negotiations between Leslie Cohn and Harry Gross, Coronet and West Thrift entered into a written agreement involving the sale by West Thrift to Coronet of certain of West Thrift's accounts. This agreement, which was entitled ''Sale of Accounts Receivable,'' described the items which were the subject of the sale as follows: '' [A]ll of the conditional sales contracts, personal loan accounts and chattel mortgages, hereinafter referred to as 'Accounts,' and commonly designated as the 'Profit & Loss Accounts of Northern California Thrift' listed on bottom of March 31, 1962 financial statement Balance of charge-of [sic] accounts (1639) $414,660.94. . . .'' The agreement further provided that Coronet was to pay West Thrift 7½ percent of the balances owing on the transferred accounts, or $30,000 for $400,000 of accounts. Additional terms and conditions of the agreement consisted of the following: (1) The agreement provided that the accounts were sold to Coronet on '' 'Non-Recourse' '' ''excepting that, if for any reason, West Thrift is unable to convey clear and good title, right and interest in the entirety for any account or accounts, then such account or accounts shall be reassigned by Coronet to West Thrift, and West Thrift will reimburse or credit Coronet at the same rate as set forth in this document,'' that is, at the rate of 7½ percent of the face value of the reassigned accounts; (2) the agreement provided that if any of the accounts sold by West Thrift had been

previously assigned to any collection agency or attorney who might be holding such accounts under a claim of right, title or interest, West Thrift would endeavor to secure reassignment of such accounts, and that in the event such reassignment was not made within 30 days from the date of sale, West Thrift would reimburse or credit Coronet for such accounts at the rate of $7\frac{1}{2}$ percent of their face value; (3) finally the agreement provided that West Thrift would furnish Coronet with all information it possessed concerning the accounts included in the sale, such information to include but not to be limited to "ledger cards, applications, work cards, contracts, promissory notes, documentation, and evidence of chattel, correspondence and any other pertinent records or material."

In addition to the terms contained in this agreement West Thrift, by letter dated April 25, 1962, agreed that in the event that the face value of the accounts sold to Coronet totalled less than $400,000, Coronet would receive a credit at the rate of $7\frac{1}{2}$ percent of the difference between $400,000 and the actual face value of the accounts sold.

To discharge its obligation under this sale agreement, Coronet, on April 24, 1962, executed a promissory note in the amount of $30,000 payable to West Thrift. The note provided for monthly payments in the amount of $500 and further provided that upon Coronet's default in the payment of any installment for a period of 30 days, the balance due on the note would become due and payable at the option of the holder.

The record discloses that prior to the execution of the subject contract the accounts which were to be the subject of the sale were inspected by Leslie Cohn and several of Coronet's employees; that at the time the contract was executed, West Thrift furnished Coronet with a list of the accounts which were included in the sale transaction; that this list contained notations as to whether or not each account was documented; and that at the time of the sale Cohn, who was an experienced man in the credit collection business, knew that the accounts Coronet was buying had been extensively "worked" by West Thrift and its predecessor, knew that the accounts had been charged-off as of no value to West Thrift, and knew that they were "a mass of old and stale accounts" or "garbage."

Between May 23, 1962 and May 20, 1963 Coronet made payments totalling $6,000 to West Thrift upon the $30,000 note. In addition, when it was discovered that the face value of the

accounts transferred to Coronet totalled only $390,743.15, it was agreed between Coronet and West Thrift that Coronet was entitled to a credit of $694.26 upon the note, this amount being equal to 7½ percent of the difference between $400,000 and $390,743.15. This credit due to Coronet was verified by West Thrift in a letter dated April 26, 1962. In this letter West Thrift also made reference to the fact that it would furnish Coronet with the documentation as to the transferred accounts. On this point the letter read as follows: ". . . West Thrift Company will be responsible to go through their files and assign to Coronet those files involved in the sale. . . . In addition West Thrift Company will show at the time that these files are assigned whether or not they contain necessary documentation such as conditional sales contracts or promissory notes." "In accordance with our agreement with Coronet, as set forth on April 24, 1962, it will be our responsibility to furnish this documentation."

In addition to the credit which West Thrift agreed to allow Coronet for the deficit in accounts transferred to the latter, Coronet, from time to time after September 12, 1962, attempted to reassign various accounts to West Thrift and to obtain credit therefor. Although several reasons were given by Coronet as justification for reassigning these accounts, the principal reason was that the accounts lacked documentation, that is, the promissory note, chattel mortgage or conditional sales contract applicable to the particular account had not been transferred to Coronet. Much evidence was adduced below on the issue of whether West Thrift agreed to accept these reassignments and to credit Coronet therefor. This evidence consisted of the following: (1) Accompanying the reassigned accounts were letters listing the accounts being reassigned and the reason for the reassignments; at the bottom of several of these letters appeared the notation "Received by: Walter Vandertoorn"; Cohn testified that he was never told by anyone on behalf of West Thrift that the accounts which Coronet reassigned would not be accepted and credited to Coronet's account; however, Vandertoorn, who was the temporary manager of West Thrift's San Francisco office and in charge of collection and bookkeeping, testified that he told Cohn that he did not have authority to accept these reassignments and that Cohn would have to discuss the reassignments with Harry Gross; Gross testified that he informed Cohn of Vandertoorn's limited authority; in addition, Gross testified that on one occasion Vandertoorn spoke to him concerning

Coronet's request to reassign certain accounts and that he told Vandertoorn to allow this credit in the amount of approximately $162; and (2) on the back of the September 20, October 16, December 5, 1962, and January 15, 1963 checks containing payments by Coronet to West Thrift upon the $30,000 note, Coronet placed endorsements to the effect that West Thrift acknowledged the credits due Coronet for the reassignments theretofore made; these checks were endorsed by West Thrift; however, Vandertoorn testified that he did not notice the endorsement upon the first few checks, and that when he did notice the endorsement on a subsequent check he contacted Cohn and told Cohn that he could not endorse such checks without Harry Gross' permission.

Subsequent to May 20, 1963, on which date Coronet made a $500 payment on the subject note to Northern California Finance to whom the note had been assigned by West Thrift, Coronet made no further payments on this note. As revealed by Coronet's complaint in this action, Coronet ceased making payments on the note upon the theory that its payments plus the credits from the reassigned accounts fully discharged its obligation upon the note.

In addition to the sale of accounts receivable transaction between Coronet and West Thrift, these two companies also consummated a loan transaction on April 24, 1962. According to the "Statement of Loan" West Thrift was to loan Coronet $16,500 to be repaid in 13 monthly installments of $1,500. However, the evidence showed that Coronet actually received only $15,000 and that the remaining $1,500 of the principal was retained by West Thrift in a reserve account and applied to Coronet's final payment under the loan. As collateral security for the payment of this loan, Coronet, by agreement dated April 24, 1962, assigned $33,210.92 of accounts receivable to West Thrift. In addition, in consideration for this loan, Coronet transferred to West Thrift accounts receivable having a face value of $5,860.96. Prior to the commencement of this action Coronet repaid in full the principal and interest due under the $16,500 note;[3] however, West Thrift retained the accounts receivable transferred to it by Coronet in consideration for the loan. Evidence concerning the actual value of these accounts receivable consisted of the following: The accounts were listed in their face value amount on West

---

[3]According to Leslie Cohn's testimony the loan was actually repaid approximately five months from its issuance, Coronet paying $15,000 plus interest at the rate of 10 percent per annum on the original ($16,500) and reducing balances of the loan.

Thrift's balance sheets; Leslie Cohn testified that the actual value of the accounts was approximately 80 or 85 percent of their face value or between $4,500 and $5,000; and Raymond Britton, who testified on behalf of respondents, stated that the maximum value of the accounts was 50 percent of their face value and the minimum value 10 percent, making an average value of approximately 30 or 35 percent.

The third and final transaction involved in this action consisted of a written guaranty by the terms of which Leslie and Ethel Cohn promised to answer for the indebtedness to the extent of $75,000 of Coronet and Leslie and Ethel Cohn to West Thrift. The guaranty further provided that "Lender may without notice assign this guaranty in whole or in part" and in addition contained a provision by which the guarantors would be liable for reasonable attorneys' fees and other costs incurred by the lender in the enforcement of the guaranty. This guaranty was subsequently assigned by West Thrift to Northern California Finance.

### The "Sale of Accounts Receivable" Agreement

Concerning the April 24, 1962 "Sale of Accounts Receivable" agreement, appellants contend that they were entitled to reassign to West Thrift for credit all of those accounts which, although transferred to Coronet by West Thrift pursuant to the sale agreement, did not contain documentation in the form of conditional sales contracts, chattel mortgages, or promissory notes. Appellants expound two theories in support of their contention: (1) that the provision of the contract which reads that Coronet "purchases all of the conditional sales contracts, personal loan accounts and chattel mortgages, hereinafter referred to as 'Accounts'" should be interpreted not as referring to all of West Thrift's charged-off accounts, but rather as limiting the subject matter of the sale to those specifically named items; and (2) that as to those accounts which did not contain documentation in the form of conditional sales contracts, chattel mortgages, or promissory notes, West Thrift did not convey "clear and good title, right and interest."

It is apparent that the resolution of these issues involves an interpretation of the April 24, 1962 agreement entered into between Coronet and West Thrift. Three provisions of this contract appear to be relevant to this determination: (1) the provision that Coronet "purchases all of the conditional sales contracts, personal loan accounts and chattel mortgages, hereinafter referred to as 'Accounts,' and commonly designated as the 'Profit & Loss Accounts of Northern California Thrift'

listed on bottom of March 31, 1962 financial statement. Balance of charge-of [*sic*] accounts (1639) $414,660.94''; (2) the provision that ''These accounts are sold to Coronet on 'Non-Recourse', excepting that, if for any reason, West Thrift is unable to convey clear and good title, right and interest in the entirety for any account or accounts, then such account or accounts shall be reassigned by Coronet to West Thrift, and West Thrift will reimburse or credit Coronet at the same rate as set forth in this document''; and (3) the provision that ''West Thrift further agrees to furnish Coronet all information which they may have concerning any of the Accounts included in this sale, including, but not limited to ledger cards, applications, work cards, contracts, promissory notes, documentation, and evidence of chattel, correspondence and any other pertinent records or material.''

As we have detailed above, a considerable amount of extrinsic evidence relevant to the meaning of this contract was adduced in the trial court. On the basis of the contract itself and the extrinsic evidence the trial court made lengthy and detailed findings as to the meaning of the agreement and the obligations of the parties thereunder, particularly as to Coronet's right to reassign accounts to West Thrift for credit. These findings essentially were to the effect that Coronet and West Thrift entered into a written contract for the sale of ''certain accounts receivable, conditional sales contracts, personal loan accounts and chattel mortgages'' of the total face value of approximately $400,000; that the accounts had been worked on by West Thrift, its predecessor, and attorneys and collection agencies and had been entirely written off as worthless; that Coronet knew the type and condition of the accounts as well as the condition of the title thereof, Coronet having dealt in these types of accounts and its employees having examined the accounts; that West Thrift conveyed good and clear title to all of said accounts; that although Coronet, after April 24, 1962, did attempt to reassign certain accounts to West Thrift, defendants did not acquiesce or consent to the attempted assignment, except to the extent of allowing a credit of $163.96 as an accommodation, but protested the right of Coronet to reassign accounts for credit; that West Thrift furnished to Coronet all information which the former had concerning the accounts sold; and that Coronet did not pay on account of its obligation to defendants by the reassignment of accounts.

The question presents itself, however, as to whether, assuming that these findings are supported by substantial evidence,

we are bound by them on the issue of the proper interpretation of the subject agreement. In interpreting contracts the following rules are applicable: (1) ▇▇ Where the construction of an agreement is based on its terms without the aid of extrinsic evidence the construction is one of law and the appellate court is not bound by the trial court's interpretation (*Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825]; *Meyer* v. *State Board of Equalization,* 42 Cal.2d 376, 381 [267 P.2d 257]; *Santa Clara Properties Co.* v. *R. L. C., Inc.,* 217 Cal.App.2d 840, 847 [32 Cal.Rptr. 333]); (2) ▇▇ where the trial court has properly admitted extrinsic evidence to aid in the interpretation of an agreement and where the parol evidence is such that conflicting inferences can be drawn from conflicting evidence, the appellate court will accept or adhere to the trial court's interpretation (*McManus* v. *Sequoyah Land Assoc.,* 240 Cal.App.2d 348, 353 [49 Cal.Rptr. 592]; *Parsons* v. *Bristol Dev. Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]); and (3) ▇▇ where extrinsic evidence has been received, but there is no conflict in the evidence or a determination has been made upon incompetent evidence, the interpretation of the instrument becomes a question of law and the appellate court is not bound by the trial court's interpretation of it (*Parsons* v. *Bristol Dev. Co., supra,* pp. 865-866; *Estate of Platt, supra,* p. 352; *McManus* v. *Sequoyah Land Assoc., supra,* p. 353).

Turning from these rules to the instant case, we reiterate that extrinsic evidence was adduced in the court below to aid in the interpretation of the subject agreement. ▇▇ Although appellants objected to the admission of this evidence in the trial court[4] and although they argue in their briefs that the subject agreement is clear and unambiguous, they do not now urge error on the part of the trial court in admitting the extrinsic evidence.[5] Moreover, appellants, in arguing the merits of their appeal, rely upon extrinsic evidence adduced in the trial court. Specifically they refer to acts and conduct of the parties under the subject agreement, invoking the rule of construction that when a contract is ambiguous or uncertain

[4]In response to objections made in the trial court as to the admissibility of much of this evidence, the court admitted the evidence conditionally subject to a subsequent motion to strike. At the conclusion of the trial the court ordered all of the evidence admitted without condition and denied the motion to strike this evidence.

[5]At oral argument counsel for appellants indicated by the tenor of his argument and in response to inquiry by this court that he was not claiming error in the trial court's admission of extrinsic evidence.

the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties. (*Bohman* v. *Berg,* 54 Cal.2d 787, 795 [8 Cal.Rptr. 441, 356 P.2d 185]; *Mitau* v. *Roddan,* 149 Cal. 1, 14 [84 P. 145, 6 L.R.A. N.S. 275].) Accordingly, we are entitled to assume that appellants have abandoned any assertion of error as to the admissibility of parol evidence to aid in the interpretation of the subject contract. (*Rich* v. *State Board of Optometry,* 235 Cal.App.2d 591, 603 [45 Cal.Rptr. 512]; *Blackman* v. *Kristovich,* 216 Cal.App.2d 792, 795 [31 Cal.Rptr. 413]; *People* v. *Scott,* 24 Cal.2d 774, 783 [151 P.2d 517].) ▮ And since appellants' failure to urge error in the admission of the parol evidence amounts to a waiver of any error in that respect (*Wheeling* v. *Financial Indem. Co.,* 201 Cal.App.2d 36, 44 [19 Cal.Rptr. 879]; *Utz* v. *Aureguy,* 109 Cal.App.2d 803, 807 [241 P.2d 639]; *Title Guar. & Trust Co.* v. *Fraternal Finance Co.,* 220 Cal. 362, 363 [30 P.2d 515]; 3 Witkin, Cal. Procedure (1954) Appeal, § 150, p. 2332), we must assume that the parol evidence adduced in the court below was properly admitted into evidence.

▮ Moreover, since the extrinsic evidence introduced in the trial court was conflicting and susceptible to conflicting inferences, particularly as to the construction which the parties themselves placed upon the subject agreement, and since the trial court's findings as to the intention of the contracting parties and the proper interpretation of the agreement are supported by substantial evidence, it is our duty to accept these findings which are in favor of respondents as to both theories urged by appellants in support of their contention that they were entitled to reassign undocumented accounts to West Thrift for credit.

We wish to point out that assuming *arguendo* that appellants' objection to the admissibility of the parol evidence has not been waived, we are of the opinion that the parol evidence adduced below was properly introduced into evidence on the basis that the subject contract is ambiguous as to whether Coronet agreed to purchase West Thrift's charged-off accounts in the approximate sum of $400,000 or only those accounts which were documented with conditional sales contracts, chattel mortgages, or promissory notes. The agreement was entitled ''Sale of Accounts Receivable,'' designated the accounts sold as ''conditional sales contracts, personal loan accounts and chattel mortgages,'' and also stated that these

" 'Accounts' " were those designated as the " 'Profit & Loss Accounts of Northern California Thrift' listed on bottom of March 31, 1962 financial statement Balance of Charge-of [*sic*] accounts (1639). . . ." By describing and designating the subject matter of this contract in three such divergent ways ambiguity and uncertainty is created as to the true subject matter of the contract.

We do not, however, find such ambiguity in the contract on the issue of whether appellants were entitled to reassign accounts lacking documentation on the theory that West Thrift had not conveyed "clear and good title, right and interest" in and to these accounts. Were we to disregard the parol evidence as to the meaning of this term in the contract, we would find the agreement itself controlling. In the context of the subject agreement this term is not equatable with documentation because the contract specifically provided that West Thrift agreed to furnish Coronet with all the information, including contracts, promissory notes, documentation, etc. "which they [West Thrift] may have" concerning the accounts included in the sale. From this provision it is clear that since West Thrift was only obligated to furnish whatever documentation it possessed concerning the accounts and since the parties obviously contemplated that some of the accounts which Coronet was purchasing would lack documentation, West Thrift could not be compelled to accept and give credit to Coronet for accounts which the latter reassigned on the basis of lack of documentation.

### *The $16,500 Loan to Coronet*

Appellants contend that the loan charges which West Thrift received in connection with the $16,500 loan which it made to Coronet, namely the $500 interest which Coronet paid on the loan plus the $5,860.95 of accounts receivable which Coronet transferred to West Thrift in consideration for this loan, exceeded the maximum loan charges allowable under Financial Code section 18655[6] and that the loan was therefore

[6]Unless otherwise indicated all statutory references are to the Financial Code. Section 18655 provides as follows: "The charges by an industrial loan company, broker, and all other persons on any loan, forbearance of money, credit, goods, or things in action under this division, shall not exceed in the aggregate: (a) Two and one-half percent ($2\frac{1}{2}\%$) per month on that part of the unpaid principal balance of any loan up to, including, but not in excess of two hundred dollars ($200). (b) One and one-half percent ($1\frac{1}{2}\%$) per month on that portion of the unpaid principal balance in excess of two hundred dollars ($200) up to, including,

void under section 18650, which provides that "If any amount in excess of the charges permitted by this article, including interest, is charged, contracted for, or received in the making or collection of a contract of loan, except as a result of an accidental and bona fide error in computation, such contract is void and no person has any right to collect or receive the principal, interest, or charges." Under sections 18651 and 18652 the accounts receivable which Coronet transferred to West Thrift in consideration for the $16,500 loan are properly included as a loan charge and therefore must be considered in determining whether the loan to Coronet violated the provisions of section 18655 as to the maximum loan charge allowable.

Appellants acknowledge that, pursuant to section 18649,[7] sections 18655 and 18650 do not apply "to any bona fide loan of a principal amount of ten thousand dollars ($10,000) or more or to an industrial loan company" provided that the provisions of section 18649 are not used for the purposes of evading division 7 of the Financial Code.[8] They contend, however, that because the loan which West Thrift made to Coronet exceeded 20 percent of the unimpaired capital and surplus of West Thrift, which amounted to $68,000 at the time the loan to Coronet was made, the loan was made in violation of section 18668[9] and is therefore not protected by the exculpatory provisions of section 18649.

■ Appellants' reliance upon section 18668 in relation to

but not in excess of seven hundred dollars ($700). (c) Five-sixths of one percent (5/6%) per month on any remainder of such unpaid principal balance in excess of seven hundred dollars ($700)."

[7]Section 18649 provides as follows: "The following sections of this division do not apply to any bona fide loan of a principal amount of ten thousand dollars ($10,000) or more or to an industrial loan company in connection with any such loan if the provisions of this section are not used for the purpose of evading this division. Sections 18650, 18652, 18653, 18655, 18656, 18657, 18658, 18667, 18670, 18671, 18672."

[8]Division 7 of the Financial Code, known as the "Industrial Loan Law," contains legislation pertaining to industrial loan companies. Among the chapters in this division are those relating to formation of such companies, their corporate powers, regulations of industrial loans, and prohibited practices.

[9]The pertinent provisions of section 18668 are as follows: "A company may not make unsecured loans to or hold the unsecured obligations of any one person as primary obligor in an aggregate amount in excess of 5 percent of the unimpaired capital and surplus of the company not available for dividends as provided in Section 18614; ... [S]ecured loans or obligations of any person as primary obligor made or held by a company may not, in any event, exceed in the aggregate 20 percent of the unimpaired capital and surplus of the company not available for dividends as provided in Section 18614."

section 18649 is misplaced. In the first place, it is apparent that section 18668, which is concerned with ratio formulas of loans to capital, was enacted for the benefit of the lending institution's shareholders and depositors rather than for its borrowers; accordingly the decisions in this state recognize that a borrower cannot avoid payment on his loan on the ground that the loan was made in violation of statutory provisions regulating the maximum amount of loans which a lending institution may make. (*Blochman Commercial etc. Bank* v. *F. G. Invest. Co.*, 177 Cal. 762, 764-765 [171 P. 943]; *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn.*, 221 Cal.App.2d 705, 711 [34 Cal.Rptr. 644].) Furthermore, although an industrial loan company and its officers and employees may be subjected to penalties and controls for violating section 18668 (see §§ 18805, 18814, 18815, 18820, 18855), there is nothing in the statute which declares a loan made in violation thereof a void obligation.

Secondly, the language of section 18649 makes it clear that this section does not exclude from its protective provisions any loan which, although made in the amount of $10,000 or more, violates some other section of division 7; rather it only excludes from its coverage loans which, although on their face are in excess of $10,000, are either not bona fide, i.e., the money received by the borrower is actually less than the $10,000, or are made in the amount of $10,000 or more *for the purpose of evading* the statutory provisions in division 7. Illustrative of the application of section 18649 is the case of *Peoples Finance etc. Co.* v. *Mike-Ron Corp.*, 236 Cal.App.2d 897 [46 Cal.Rptr. 497],[10] where the plaintiff, an industrial loan company, loaned the defendants $30,000 payable in 12 consecutive monthly installments of $2,500 each. The interest rate provided for in the loan, which was contained in a promissory note secured by four deeds of trust on property owned by the defendants, was 3 percent per month or $6,000 minimum, whichever was more, with $6,000 interest paid in advance, plus a $4,000 payment in the form of a loan fee. The defendants made three monthly payments on the note and thereafter refused to make any payments. Subsequently the plaintiff brought an action to foreclose the deeds of trust and to recover a deficiency judgment on the note. By way of defense to that action the defendants contended that since they were required to pay interest at a rate exceeding 80

[10]This is the only case which has come to our attention which discusses the meaning of section 18649.

percent per annum simple interest, the loan transaction violated sections 18655 and 18650 and the purposes of section 18649 were evaded. The reviewing court upheld the trial court's construction of section 18649 that ''the evasion contemplated by the Legislature was the addition of charges or other amounts to make a loan equal to or exceed $10,000'' (p. 899) and that accordingly since the defendants had actually received a sum considerably in excess of $10,000 the loan was bona fide, there being no evidence whatsoever of any evasion.

Although, as we have concluded, the interpretation which appellants attempt to place upon section 18469 is an erroneous one, it appears that under the rationale of the *Peoples Finance* case appellants might have a valid argument that the $16,500 loan made to Coronet did not come within the exculpatory provisions of section 18649. Here, although the face amount of West Thrift's loan to Coronet was $16,500, Coronet only received $15,000 and in addition was required to pay a loan charge in the form of accounts receivable with a face value of $5,860.95. If the accounts receivable which Coronet transferred to West Thrift had an actual value in excess of $5,000, the net amount received by Coronet from West Thrift would be less than $10,000. Therefore, under the rationale of *Peoples Finance,* the loan to Coronet would not be a ''bona fide loan of a principal amount of ten thousand dollars . . . or more'' and it could be argued that West Thrift used the provisions of section 18649, that is, made the loan in an amount which was in excess of $10,000, ''for the purpose of evading'' the maximum loan charges allowable under section 18655. Under this analysis of the facts of the instant case as applied to the provisions of section 18649 it becomes crucial to determine the actual value of the accounts receivable which Coronet transferred to West Thrift in consideration for the loan.

However, since the trial court was of the opinion that regardless of the actual value of the accounts receivable the loan to Coronet did not violate the provisions of the Financial Code relating to maximum allowable loan charges, it refused to place an actual value on the accounts and found only that ''said accounts were not worth the face value. . . .''[11] In response to this finding appellants requested a

[11]The finding which the trial court made as to the legality of the subject loan reads in full as follows: ''As additional consideration for the said loan of $16,500.00 plaintiff transferred and delivered to defendant West Thrift Company additional accounts receivable of the face value of $5,860.95. The Court finds that said accounts were not worth the face

special finding as to "Whether the payment of the additional consideration for the $16,500.00 loan made by West Thrift Company to Plaintiff affected the bona fide character of the loan of $16,500.00 and whether the additional consideration was not to be used for the purpose of evading the provisions of the Industrial Loan Company Act." In view of this state of the record, our problem becomes one of determining whether the judgment must be reversed because of the failure of the trial court to make findings on the issues specifically requested by appellants. It is clear, under our analysis of section 18649, that two material issues involved in the instant case were whether or not the loan to Coronet was a "bona fide loan of a principal amount of ten thousand dollars . . . or more" and whether West Thrift made the loan to Coronet in excess of $10,000 "for the purpose of evading" the statutory provisions in division 7 as to the maximum allowable loan charges.

That it is the duty of the trial court to make findings on every material issue raised by the pleadings is a well-established principle of law. (*Auer* v. *Frank,* 227 Cal.App.2d 396, 406 [38 Cal.Rptr. 684, 8 A.L.R.3d 1108]; *De Burgh* v. *De Burgh,* 39 Cal.2d 858, 873 [250 P.2d 598]; *Mason* v. *Ennes,* 172 Cal.App.2d 99, 104 [342 P.2d 79].) Moreover, although in the absence of a request for special findings on such material issues, the judgment may be upheld on the basis that findings consistent with the judgment can be implied on such issues from those findings which the trial court actually made, the doctrine of implied findings does not apply where a request for special findings as to these issues is made. (Code Civ. Proc., § 634; *Auer* v. *Frank, supra,* p. 406; *B. C. Richter Contracting Co.* v. *Continental Cas. Co.,* 230 Cal.App.2d 491, 504 [41 Cal.Rptr. 98]; *Fairbairn* v. *Fairbairn,* 194 Cal.App.2d 501, 513-514 [15 Cal.Rptr. 548]; *Calloway* v. *Downie,* 195 Cal. App.2d 348, 353 [15 Cal.Rptr. 747]; *Ruppert* v. *Jackson,* 212 Cal.App.2d 678, 681-682 [28 Cal.Rptr. 467].) Under these principles it would seem that the trial court was required to have made findings on the issues raised by appellants' request for special findings and that its failure to do so constituted reversible error.

However, by way of limitation to these rules, we note that regardless of whether special findings are requested a party

value and it is unnecessary to fix the true value of the accounts because the Court finds that the loan was not usurious or in violation of the Industrial Loan Act and therefore the fixing of the value is not required and is immaterial."

cannot complain of the failure of the trial court to make a finding that would necessarily have been adverse to him. (See *Arsenian* v. *Meketarian,* 138 Cal.App.2d 627, 633 [292 P.2d 293]; *Goldberg* v. *Paramount Oil Co.,* 143 Cal.App.2d 215, 224 [300 P.2d 329]; *Pry Corp. of America* v. *Leach,* 177 Cal.App. 2d 632, 637 [2 Cal.Rptr. 425].) The reason for this rule is that the failure to find on an issue is not prejudicial to the appellant unless it appears that there is evidence introduced as to such issue sufficient to sustain a finding in his favor. (See *Petersen* v. *Murphy,* 59 Cal.App.2d 528, 534-535 [139 P.2d 49]; *Powell* v. *Johnson,* 50 Cal.App.2d 680, 683 [123 P.2d 875].) Applying this rule to the instant case, we note that as to the issue of whether West Thrift's loan to Coronet was a "bona fide loan of a principal amount of ten thousand dollars . . . or more," the trial court could only find in favor of appellants on this issue if it found that the accounts receivable which Coronet transferred to West Thrift in consideration for this loan had an actual value in excess of $5,000. Since neither witness who testified as to the actual value of these accounts placed their value in excess of $5,000[12] the only evidence which would support a finding that these accounts had an actual value in excess of $5,000 is the evidence relating to the fact that these accounts were listed at face value on West Thrift's balance sheets. However, since the trial court did expressly find that the accounts were not worth their face value, it is apparent that it rejected the theory that the face value of the accounts should be deemed their actual value. Thus, we are presented with a record which contains no evidence to support a finding that the actual value of the accounts exceeded $5,000. The same is true as to appellants' requested finding on the issue of whether the provisions of section 18649 were used by West Thrift "for the purpose of evading" any of the provisions of division 7. As to this issue there is no evidence to support a finding in favor of appellants. Accordingly, we conclude that notwithstanding the trial court's failure to make the specific finding requested on the issues relating to section 18649, since the record contains no evidence which would support the requested finding, the finding actually made by the trial court suffices to support the judgment.

---

[12]With respect to this issue, Leslie Cohn, who testified on behalf of appellants stated that the value of these accounts was between $4,500 and $5,000, while Britton, who testified for respondents, stated that they were worth approximately 30 or 35 percent of their face value and that the maximum value of any of such accounts was 50 percent.

### Attorneys' Fees on Appeal

The written guaranty entered into between the parties, which guaranty was the subject of Northern California Finance's cross-complaint, provided that "Guarantors agree to pay a reasonable attorneys' fee . . . which may be incurred by Lender in the enforcement of this guaranty." At oral argument Northern California Finance requested that this court award it reasonable attorney's fees for services rendered by its counsel upon appeal. It is established in this state that a contract which provides for reasonable attorney's fees in conjunction with the enforcement of its provisions embraces an allowance for legal services rendered upon appeal as well as during the trial and that the appellate court has authority to set reasonable attorney's fees. (*Wilson* v. *Wilson,* 54 Cal.2d 264, 272 [5 Cal.Rptr. 317, 352 P.2d 725]; *Dankert* v. *Lamb Finance Co.,* 146 Cal.App.2d 499, 503-504 [304 P.2d 199]; *Cirimele* v. *Shinazy,* 134 Cal.App.2d 50, 52 [285 P.2d 311, 52 A.L.R.2d 860]; *Hahn* v. *Hahn,* 123 Cal.App.2d 97, 103 [266 P.2d 519]; *Coordinated Constr., Inc.* v. *Canoga Big "A," Inc.,* 238 Cal.App.2d 313, 320 [47 Cal.Rptr. 749].) Accordingly, we find the sum of $350 to be a reasonable sum for attorney's fees on this appeal.

The judgment, as amended to include therein an order that cross-complainants Coronet Credit Corporation, Leslie Cohn and Ethel Cohn are entitled to no relief on their cross-complaint against cross-defendants West Thrift Company, Northern California Finance Company, Harry Gross and Leonard Gross, is affirmed. Appellants are ordered to pay to respondent Northern California Finance Company attorney's fees on this appeal in the amount of $350. Respondents shall recover costs on appeal.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied October 4, 1966, and the petition of all appellants for a hearing by the Supreme Court was denied November 2, 1966.