FOURT, J.
 

 W & B Realty Co., Inc., Continental Parking Corporation and Walter M. Briggs (hereinafter sometimes referred to collectively by the name in which they conducted their parking lot operation Saf T Park) appeal a judgment entered in favor of the plaintiff Erbe Corporation (hereinafter sometimes referred to as Erbe) by the trial court sitting without a jury. The court awarded Erbe treble damages, attorney’s fees, rent and taxes in a judgment exceeding $32,000 in this action for unlawful detainer.
 

 Appellants contend that the trial court committed prejudicial error in striking appellants’ cross-complaint, failed to make findings on all material issues raised by appellants’ affirmative defense, entered certain findings unsupported by the evidence, and awarded excessive damages.
 

 On July 14, 1960, Erbe was the owner of certain unimproved real property commonly known as 1053 Wilshire Boulevard which was used as a public parking lot adjacent to Woodbury College in Los Angeles. On that date Erbe entered a written renewal lease of the premises for parking lot operation with W
 
 &
 
 B Realty Co., Inc., for a term of five 3rears, expiring July 31, 1965. Continental Parking Corporation is the successor in interest to the lessee by change of the corporate name, and the lot was operated under the name of a subsidiary, Saf T Park. The lease was personally guaranteed by Walter M. Briggs as president of the lessee corporations.
 

 In January 1965, Erbe negotiated the terms of a new lease for the parking lot with Allright of Los Angeles, Inc. (hereinafter sometimes referred to as Allright), and on April 19, 1965, the parties executed a written lease providing for Allright to take possession on August 1, 1965. Meanwhile, Briggs, acting on behalf of Saf T Park, approached Mrs. Wood, treasurer of Erbe, concerning a new lease, but she refused to discuss it pending payment of delinquent tax
 
 *772
 
 overages owed by the lessee under the unexpired lease. She did not tell Briggs about the new lessee until June 1965, for fear the company might refuse to pay its debt. Shortly after Briggs learned that Erbe had leased the lot to another tenant, the Saf T Park operating manager and vice-president, Mr. Hagopian, was advised by Mr. Bruce, president of Allright, that Allright was the new lessee and planned to take over the parking operation pursuant to their lease on August 1,1965.
 

 Hagopian then and on several subsequent occasions offered, on behalf of Saf T Park, to purchase the lease from Allright, which steadfastly refused to sell. Meanwhile, Briggs took the position that Erbe had no right to execute a lease with Allright because Briggs had obtained from Mrs. Wood, as an authorized officer of Erbe, an oral lease agreement under which Saf T Park was entitled to operate the lot for up to one year after the expiration of their written lease. Despite Briggs’ testimony, Mrs. Wood denied that she entered such an agreement with appellants, or any of them. Appellants, on July 29, 1965, filed an action against Erbe alleging breach and repudiation of the purported oral lease, and on July 31, 1965, Hagopian informed Bruce that Saf T Park did not intend to give up possession of the lot.
 

 August 1, 1965, was a Sunday and the parking lot was not open for business. However, Ellis Spencer, Allright’s manager, visited the lot at about
 
 4
 
 a.m. to clean it up and to erect Allright’s signs in preparation for the opening of business on Monday, August 2. Spencer was met at the lot by Allright’s night supervisor, George Solomon. They found there two armed guards hired by Saf T Park under instructions to allow no one on the lot, and when Spencer claimed the right to be there under the Allright lease, the guards notified their supervisor. Spencer called the police, who advised him to request that the owner appear and order the guards to leave. Accordingly, Spencer notified Bruce who, in turn, called Mrs. Wood as representative of the lessor.
 

 Between 7 and 8 a.m. others arrived at the lot, including Allright’s maintenance man and Allright’s Sunday supervisor, the Saf T Park attorney and other Saf T Park employees. Around 8 :15 a.m. Mrs. Wood drove up and shortly thereafter the police appeared in response to Spencer’s summons. When Bruce drove onto the parking lot, Mrs. Wood addressed the assembled personnel of Saf T Park, told them that Allright was going to occupy the property
 
 *773
 
 under its lease, and commanded that the trespassing Saf T Park people leave. The Saf T Park guards were then directed not to interfere while Allright installed signs on the premises, and an Allright attendant remained on duty thereafter to clean up the lot.
 

 Saf T Park’s manager also stayed at the lot until 4 p.m. on Sunday, then left the guards and the Allright attendant, but returned at midnight. At about 4 a.m. Saf T Park’s vice-president, Hagopian, arrived with 16 men who began to tear down the newly erected Allright signs. Hagopian also warned Spencer that he planned to stay and operate the lot that day, so Spencer once again called the police, who arrived in time to view the continuing sign destruction. The police directed the parties to appear before the police commission at 9 a.m. Monday. Spencer and Hagopian agreed that each would leave one attendant pending that meeting.
 

 About 4:20 a.m., however the Saf T Park maintenance man ehainlocked the two driveways. Hagopian testified that he arranged for the security guards in order to avoid violence on the premises, and that he authorized the chains and locks to be placed on the drives pursuant to police instructions. When the parties appeared before the police commission later that morning, the police directed that neither should operate the lot until their dispute was settled and warned that if there was any more violence with respect to possession of the premises, the police would file complaints on all lots operated by both companies. Saf T Park kept the drives locked and retained the two armed guards on the premises until November 1, 1965. Allright hired no guards but Allright and Saf T Park, by agreement, each stationed an employee on the premises throughout that period. No public parking business was conducted on the lot between August 1 and October 31, 1965, and Erbe received no rent for that period from either party.
 

 On October 28, 1965, appellants notified Erbe by letter that they were giving up possession due to "the persistent and continued interference by employees of Erbe Corp. and Allright of Los Angeles Inc. with the operation of said premises as a parking lot.” They steadfastly maintained, however, their "right to possession of the premises.” Until October 31 appellants, who operated five other parking lots within a two-block radius, forcibly prevented Allright from entering into possession. Appellants were able during this
 
 *774
 
 period to divert ears into their other lots and thus caused serious damage to the business of the subject lot. Allright had no nearby lot until October 28, 1965, when they obtained and started to operate a small lot half a block away.
 

 From this evidence the trial court found that appellants intentionally and deliberately retained possession of the 'premises after their lease had terminated, with notice that 'it would not be renewed or extended, that the premises had been let to a new tenant, and that the new tenant would not sell or assign its lease to appellants. Appellants, moreover, attempted to hold over possession by use of armed guards under instructions to prevent others from coming on the premises and locked chains across the entrance, thus interfering, inhibiting and preventing Allright from using the property and depriving Erbe of the rental to which it was entitled. The court found further “That said guards, parking attendants and locked chains were placed and maintained upon the premises for tile purpose of preventing Allright Los Angeles, Inc. from entering upon, taking possession of and operating its auto parking business on said premises.” Finally, the trial court found that appellants’ allegations of forcible entry by Erbe, asserted by way of affirmative defense, were in all material respects untrue.
 

 Appellants were not, as they contend, prejudiced because the trial court struck their pleading entitled “cross complaint.” Although the defendant in an unlawful detainer action is clearly limited to answer or demurrer (Code Civ. Proc., § 1170) to preserve the summary character of the action from issues irrelevant to the right of immediate possession, and the court has jurisdiction to strike a cross-complaint filed in such an action, such pleadings are permitted when a defendant surrenders possession before trial.
 
 (Turem
 
 v.
 
 Texaco, Inc.,
 
 236 Cal.App.2d 758, 763 [46 Cal.Rptr. 389].) In the instant case appellants surrendered physical possession of the premises before the trial, but in both their pretrial statement of issues and their written notice of surrender they steadfastly maintained their legal right to possession. An unlawful detainer action is the appropriate means to test any question of immediate possession to real property, whether the defendant is in actual physical possession or merely claims the legal right to immediate possession.
 
 (Stockton Morris Plan Co.
 
 v.
 
 Carpenter,
 
 18 Cal.App.2d 205 [63 P.2d 859].) As a result, it
 
 *775
 
 cannot be said that appellants had abandoned their claim to possession.
 

 Appellants further contend that the subject matter of their cross-complaint constitutes a compulsory counterclaim and prejudice occurs because, if the issues therein asserted are not raised in the present action, appellants •will be foreclosed from litigating them in the future. This position ignores the fact that the charging allegations of appellants’ affirmative defense reproduce verbatim the assertions of forcible entry on the part of Brbe set forth in the stricken cross-complaint. Appellants made the same allegations in their answer, enjoyed the opportunity to present any competent evidence which might support these allegations, and are now foreclosed from successive adjudication of the issues joined. The trial court found that they were entitled to no offset for damages from forcible entry;
 
 a fortiori
 
 they can claim no affirmative relief. Clearly no prejudice resulted as a consequence of the trial court’s action in striking the cross-complaint.
 

 Appellants are dissatisfied with the trial court’s findings on their affirmative defense, contending- that these findings are indefinite and uncertain, unsupported and even contrary to the evidence. This position is refuted by the record. The trial court found that the allegations of each paragraph in appellants’ affirmative defense were untrue, except as otherwise specifically noted in the findings. This is tantamount to finding that Brbe committed no acts constituting forcible entry and constitutes an adequate, clear and responsive finding of fact.
 
 (Schaefer
 
 v.
 
 Berinstein,
 
 180 Cal.App.2d 107, 127 [4 Cal.Rptr. 236];
 
 Nelson
 
 v.
 
 Schumacher,
 
 130 Cal.App. 278, 281 [19 P.2d 996].)
 

 Conceding that the landlord is limited to his judicial remedy to recover possession of leased premises by unlawful detainer, we do not find that Brbe exceeded its rights, either directly or by condoning the acts of Allright personnel. Both Brbe and Allright made peaceful efforts to have Saf T Park leave the premises; Saf T Park prepared for and reacted with force and violence. Mrs. Wood requested Saf T Park personnel to surrender possession. Saf T Park allowed Allright to erect its signs without intervention, only to return later in force to tear down and destroy the Allright signs. Saf T Park resorted to the use of armed guards and locked chains to prevent others from coming on the premises. There is no evidence that Allright attempted to tear
 
 *776
 
 out Saf T Park fixtures or break the chains to enter upon and operate the parking lot. Allright and Erbe exercised neither force nor violence. They were privileged to make the reasonable request that Saf T Park leave, to request police intervention to prevent any outbreak of violence, and to make legitimate efforts to obtain possession so long as they eschewed force and acceded to police commands to refrain from further action when force was threatened by others. The acts committed by Erbe and Allright were committed not against a tenant in peaceful possession, but one which held over deliberately, intentionally, and obstinately, with notice and knowledge that their tenancy had terminated, and thus obstructed and interfered with the conduct of Allright’s business to the advantage of their own. The evidence discloses reasonable efforts on the part of Erbe and Allright to gain a peaceful objective and render meaningful their legal lease relationship, and thus sustains the conclusion that Erbe did not attempt a forcible entry.
 

 Finally, the award of damages was proper under these circumstances. Judgment against the defendant guilty of unlawful detainer may, in the discretion of the court, be entered either for the amount of the damages and the rent found due, or for three times the amount so found. (Code Civ. Proc., § 1174.) “The rule appears to be well established in California that a lessee of real property who wilfully, deliberately, intentionally and obstinately withholds possession of the property, with knowledge of the termination of his lease and against the will of the landlord, is liable for treble damages.”
 
 (Gwinn
 
 v.
 
 Goldman,
 
 57 Cal.App.2d 393, 400 [134 P.2d 915].) We find no abuse of discretion herein. In addition, the trial court properly awarded attorney’s fees pursuant to the lease provision supporting such an award, and respondent is entitled to attorney’s fees on appeal under the same provision. (Ciri
 
 mele
 
 v.
 
 Shinazy,
 
 134 Cal.App.2d 50 [285 P.2d 311, 52 A.L.R.2d 860].) “It is established in this state that a contract which provides for reasonable attorney’s fees in conjunction with the enforcement of its provisions embraces an allowance for legal services rendered upon appeal as well as during the trial and that the appellate court has authority to set reasonable attorney’s fees.. [Citations.] ” .
 
 (Coronet Credit Corp.
 
 v. West
 
 Thrift Co.,
 
 244 Cal.App.2d 631, 649 [53 Cal.Rptr. 433].)
 

 
 *777
 
 We think and find that a fee of $750 is reasonable for legal services rendered on the appeal. Appellants are ordered to pay to respondent Erbe Corporation, a California corporation, attorney’s fees on this appeal in the amount of $750.
 

 The judgment is affirmed.
 

 Wood, P. J., and Lillie, J., concurred.
 

 A petition for a rehearing was denied November 27, 1967, and appellants’ petition for a hearing by the Supreme Court was denied January 3, 1968.