[Civ. No. 8079. Fourth Dist., Div. Two. Feb. 20, 1967.]

NORMAN A. WHITTAKER, Plaintiff and Appellant, v. MAE F. OTTO et al., Defendants; AUGUST CHOPP et al., Defendants and Respondents.

Forslund & Wilson and Douglas E. Wilson for Plaintiff and Appellant.

Overton, Lyman & Prince, Lawrence J. Larson, Wallace K. Downey and Lynn O. Paulson for Defendants and Respondents.

McCABE, P. J.—Action for general and punitive damages for trespass upon a mining claim and conversion of a quantity of iron ore. From an adverse judgment of the Superior Court in and for the County of Inyo, plaintiff prosecutes this appeal. The attempted appeal from the order denying a motion for a new trial should be dismissed as being from a nonappealable order.

The mining claims which are the subject of the present controversy lie some seventeen or eighteen miles north of Trona in the Argus Mountains near the Panamint Valley, Inyo County, California. They were originally patented in 1911, and recorded January 12, 1912, from the United States to The Iron Cap Copper Mining Company, a corporation; that company was incorporated in Wyoming but forfeited its right to do business in California in November 1912. The major stockholder of that corporation and the then sole surviving director, Percy Hagerman (hereinafter Hagerman) deeded the claims to himself as Trustee in 1944 "as sole surviving director of The Iron Cap Copper Mining Company, a defunct corporation."

Commencing in the year 1946, one Merle F. Otto was employed as caretaker upon the property. He paid the annual real property taxes assessed thereon, claiming reimbursement from the son of Hagerman who had undertaken to manage his father's affairs. Merle F. Otto (hereinafter Otto) was in possession of the claim throughout this period and had placed signs on the claim which read "Merle F. Otto, Agent for Owner." At sometime during 1958 these posted signs were changed to read "Merle F. Otto, Owner" and on or about April 7, 1958, Otto executed a deed to the claims to himself as grantee.

Hagerman's son, Lowry Hagerman, on or prior to November 25, 1958, gave an option to lease these mining claims (hereinafter called the Monarch Claims) to the plaintiff, Norman A. Whittaker. This option was approved by the Superior Court in and for the County of Inyo on November 25, 1958, and the order approving the option was recorded at plaintiff's request in the official records of said county on December 15, 1958. Plaintiff, exercising this option, was named as lessee under an Iron Ore and Mineral Mining Lease covering the Monarch Claims made and executed by Lowry Hagerman on January 21, 1959.

During the interim, however, Merle F. Otto and his wife, Mae F. Otto, had executed a purported lease covering the

Monarch Claims in favor of one August Chopp, a defendant herein. This lease was not recorded until September 11, 1959.

Defendant Chopp in turn contacted the present codefendants John Descher, Raymond Descher and Clarence R. King,[1] who agreed to enter into an association to mine the Monarch Claims in December 1958. This association, found by the trial court to be a joint venture, did business as Jarco Mining Co. Subsequently this association was incorporated in California as Jarco Mining, Inc. and in July 1959 the leasehold interest of August Chopp was assigned to the newly formed corporation. The defendants in the joint venture, the Jarco Mining Co. and Jarco Mining, Inc., are hereinafter referred to as the Jarco group.

On February 2, 1959, plaintiff filed an action in ejectment against Merle F. Otto and various Does in Inyo County. A lis pendens was recorded on the Monarch Claims on February 5, 1959. Thereafter a judgment in favor of plaintiff Whittaker that he recover possession of the Monarch Claims and the iron ore and other minerals situate thereon as against Otto was entered on April 24, 1960. Among the issues raised by Otto in that action by the pleadings and otherwise was "whether or not plaintiff has a valid leasehold or other interest in the mining claims which are the subject of the action." In raising this question, Otto attacked by pleading and in court the legal title and authority of Whittaker's lessor to execute a lease in Whittaker's favor. The trial court in that action found Whittaker was a lessee and concluded his lessor was in possession of the premises and had been at all times entitled to possession of the Monarch Claims as against the parties to that action. Otto prosecuted an appeal to this court which affirmed the judgment in the ejectment action and that judgment has long been final. (*Whittaker* v. *Otto,* 188 Cal.App.2d 619 [10 Cal.Rptr. 689].)

The individual defendants comprising the Jarco group were admittedly aware of Whittaker's claim of right to possession of the Monarch Claims in early 1958. In fact, several of them attended the trial of the matter before the court in Inyo County. Additionally, defendant Chopp previously had personally checked the status of the recorded title in the official records of Inyo County and had ascertained title was in the

---

[1]Defendant Clarence R. King died pending appeal and by order of this court on November 30, 1965, the executrix of his estate, Mae Bass King, was substituted in his place and stead.

Hagerman estate and was not in Otto, his lessor. The members of the Jarco group, concerned with their legal status in possession of the Monarch Claims, consulted an attorney in Independence, one Smith, who was also counsel of record for Otto in the ejectment action, concerning their right to mine the iron ore on the Monarch Claims on or about January 28, 1959. Entries in defendant King's diary on the date of that meeting with Smith, introduced in evidence in this action, indicated they were told:

"1. Nobody has title clear.

"2. Otto has best chance if continuous possession.[2]

"3. Thinks can win if somebody else contests Otto."

The ore deposit was marked by surface outcrop of ore with the major portion of the ore body covered by dirt and other geological debris. The Jarco group initially attempted to do some preparatory work on the site to prepare it for open-face mining, but finding the task beyond their limited equipment and labor resources, they employed one William V. Skinner, doing business as Brownstone Mining Company, to prepare the site and mine the ore for them. This work was commenced by Skinner and his men in the week of October 9 to 16, 1959. In preparing to remove the ore, Jarco and Skinner built several roads to the outcrop of ore and built three mining benches,[3] which constructed changes lay across the top of the major portion of the ore body. Some 5,038.3 tons of ore were removed from the Monarch claims during the months of October, November and December 1959. The ore removed was sold by the Jarco group under a contract to codefendant California Portland Cement at $7.25 per ton for a total of $36,527. The contract under which California Portland Cement purchased this ore had been signed on September 9, 1959.

Plaintiff Whittaker had previously contacted California Portland Cement by letter dated April 23, 1959. In this letter he attempted to interest this concern in a limestone deposit he owned *some ten miles* to the north of Monarch Iron Cap, but he mentioned during the course of the letter that he owned an iron mine "about 11 miles to the south." A geologist with California Portland, one J. E. Joyce, responded to his letter on May 5, 1959, expressing his company's interest in the iron

[2]Otto claimed title to the claims as an adverse possessor, but this claim was rejected on appeal since Otto had entered into possession as agent of Hagerman and hence his possession was not adverse to the title of the paramount owner.

[3]Working areas for mining crews used in open-face mining. Usually composed of fill and debris from the area surrounding the mine.

deposit 11 miles south of the limestone. On July 8, 1959, Whittaker wrote to Joyce, "The one referred to in my letter is 17 miles north of Trona. This is quite a large high grade iron deposit. The iron is chiefly hematite, running about 30% magnetite. But it is very dense and heavy. It runs an average of 67% Fe [Iron] and under 4% silica; other impurities are nil such as phos, sulphur, titanium, copper and arsenic." He then stated the property was available for purchase or he would mine it under contract. Joyce responded once more on July 15, 1959, expressing further interest.

Prior to this time Joyce had investigated a large iron deposit referred to him on December 1, 1958, which was purportedly 14 miles north of Trona and purportedly owned by one Gus Chapp, (August Chopp—one of the codefendants herein). On December 17, 1958, he wrote to this defendant asking to visit the property. In company with Chapp (August Chopp) he visited the property on December 28, 1958, and obtained a large sample for analysis. This sample analyzed as containing by weight from 64 to 95 percent $Fe_2O_3$ [ferric oxide] or from 46 to 67 percent iron by weight. In a memorandum written to a purchasing agent on January 26, 1959, he noted the property was 18.4 miles north of Trona [from the railroad loading platform in Trona] and was known as Monarch [4 patented claims] and Iron King [4 unpatented claims]. In the same communication he noted the claim had been worked previously and indicated he was previously aware of the deposit. At that time defendant California Portland never inquired as to the ownership of the ore it purchased. Since filing of this suit, and admittedly as the causative factor, it now makes this inquiry of the claims from which it purchased the ore.

After the judgment in the ejectment action was affirmed on appeal, plaintiff obtained a writ of possession on the Monarch Claims on April 25, 1960, and according to the affidavit of service, it was personally served on Raymond Descher and Otto on May 11, 1960. About January 8, 1960, however, Jarco fulfilled its initial contract with defendant California Portland. Due to Jarco Mining's uncertain title to the ore, California Portland, upon being informed of Whittaker's claims, declined to purchase any more ore from the Monarch Claims.

During the course of the trial, Whittaker, his wife, and his son testified that on numerous occasions during 1958 and 1959, they had erected signs on the Monarch Claims which read "N. A. Whittaker, Owner," that on each occasion they

returned to the property, they found new signs reading "Merle F. Otto, Owner," which they always replaced with signs indicating Whittaker's ownership. The members of the Jarco group testified that no such signs were found upon the property. Skinner testified that when he came onto the property he noticed several such signs. On cross-examination defense counsel ascertained the Jarco group still owed him $600 for his work. This evidence may be characterized as impeaching testimony. Joyce testified he noticed several signs but did not recall what was posted on them.

Additionally, the Jarco group counterclaimed for the value of the improvements which they had placed upon the leased property. During the course of the trial, plaintiff and defendants testified and introduced the testimony of expert witnesses concerning the value of the ore taken from the land, the value of the possible credits which the defendants might have, and the measure of damages which plaintiff might recover by reason of the Jarco group's purported trespass.

A determination of the issues presented by this appeal *en seriatim* first presents the right of the plaintiff to maintain this action. Parenthetically, as to this issue, the trial court found that it was true that at all times mentioned in plaintiff's complaint plaintiff was named as a lessee under a purported Iron Ore and Mineral Mining Lease made in writing and entered into January 21, 1959, and purportedly covering Monarch Claims located in Inyo County, California. The trial court found it was not true that at all times mentioned in the complaint, the lease was in full force and effect. The court also found that at the time of trial the lease was not in full force and effect, and additionally the court found plaintiff had not complied with all terms of the alleged lease and was not entitled to the possession of said premises or of the rents or profits or ores or minerals of said premises. Also, the court found the purported lessor thereunder had no power or right, either individually or in any representative capacity, to lease the premises covered thereby or to execute said purported lease.

This conclusion as to plaintiff's standing to maintain this action is, in our opinion, erroneous as a matter of law. ■ As a general proposition it is well-settled that the proper party plaintiff in an action for trespass to real property is the person in actual possession. (*McDonald* v. *Bear River etc. Water & Min. Co.*, 13 Cal. 220, 230; *Strohlburg* v. *Jones*, 78 Cal. 381, 383 [20 P. 705]; *Uttendorffer* v. *Saegers*, 50 Cal.

496; *Raffetto* v. *Fiori*, 50 Cal. 363; *Covo* v. *Lobue*, 220 Cal. App.2d 218, 221 [33 Cal.Rptr. 828]; *Brenner* v. *Haley*, 185 Cal.App.2d 183, 187 [8 Cal.Rptr. 224].) A defendant who is a mere stranger to the title will not be allowed to question the title of a plaintiff in possession of land. (*Lightner Min. Co.* v. *Lane*, 161 Cal. 689, 695 [120 P. 771, Ann.Cas. 1913C 1093]; *Golden Gate Mill & Min. Co.* v. *Joshua Hendy Machine Works*, 82 Cal. 184, 186 [23 P. 45]; *McCarron* v. *O'Connell*, 7 Cal. 152; *Fitzgerald* v. *Urton*, 5 Cal. 308, 309; *Eberhard* v. *Tuolumne Water Co.*, 4 Cal. 308.)

 Only in the circumstance that defendants could lay some claim to title to the claim by bringing themselves "in some privity with the common source of title," may they question the validity of plaintiff's title. (*Zumwalt* v. *Dickey*, 92 Cal. 156, 158 [28 P. 212]; *Lightner Min. Co.* v. *Lane, supra*, 161 Cal. 689; *Hebbron* v. *Graves*, 78 Cal. 380 [20 P. 740]; *Foss* v. *Hinkell*, 78 Cal. 158 [20 P. 393]; *English* v. *Johnson*, 17 Cal. 107, 116 [76 Am. Dec. 574]; *Doll* v. *Meador*, 16 Cal. 295; *Weimer* v. *Lowery*, 11 Cal. 104, 112; *North Noonday Min. Co.* v. *Orient Min. Co.*, 1 F. 522, 536-537; *Alechoff* v. *Los Angeles Gas & Electric Corp.*, 84 Cal.App. 33, 41 [257 P. 569]; 1 Ricketts, American Mining Law, (4th ed. 1948) § 391, fn. 41, p. 239.)

In *McFeters* v. *Pierson*, 15 Colo. 201 [24 P. 1076, 22 Am.St. Rep. 388] the Supreme Court of Colorado was confronted with an analogous circumstance. The plaintiff, purported owner of a mining claim as a locator of an unpatented mining lode claim, brought an action in trespass for the unlawful entry and cutting of standing timber by defendants. Defendants, by their answer and in argument, urged the plaintiff, not being in possession or having legal title, did not have sufficient interest in the property to maintain the action. After finding plaintiff's filing of the location certificate vested fee ownership to the claim in the plaintiff, the court held: "It is conceded [by defendants] that the evidence tended to establish plaintiffs' claim to the premises under the mining laws of the United States and of this state, and that they had the qualifications required by law to entitle them to make a mining location; but it is insisted that plaintiffs were bound to prove themselves in actual possession of the premises as alleged in their complaint. To maintain an action for injury to a mining claim, it is not necessary that claimant should reside on the premises, nor that it should be inclosed or cultivated, nor that he should have a *pedis possessio* of the claim

. . . Having made and marked the discovery, and filed his certificate, having performed and kept up the work necessary to perfect his claim, and having otherwise complied in good faith with the requirements essential to a valid and subsisting location, and being in the actual and lawful control of the claim, for the purpose of working and developing the same, he is, while continuing such relations to the property, entitled to the exclusive possession and enjoyment thereof against the whole world. . . . It is entirely immaterial whether or not plaintiffs had the technical possession requisite to the maintenance of trespass *quare clausum fregit* at common law; for since they were entitled to the exclusive possession and enjoyment of the mining claim, and had title to occupy same, they could maintain a civil action under the Code for any unlawful injury thereto committed by a stranger without right or title.''

Similarly, the Supreme Court of Michigan in *Hartford Iron Min. Co.* v. *Cambria Min. Co.*, 93 Mich. 90 [53 N.W. 4, 6, 32 Am.St.Rep. 488, 493], considered the right of a plaintiff in possession of land under a mining lease to maintain an action in trover for the conversion of a quantity of iron ore against the assertion that plaintiff had no standing to assert such a claim as he was not in actual possession of the leasehold and defendant was in possession under claim of right, hence an action in trover will not lie. The court disregarded this defense since ''the only possession of this particular strip in question which defendant had was such as enabled it to mine and convert the property [ore] in question.''

■ A similar result accords in the case at bench. Plaintiff herein was in possession under a written lease. It is not necessary to maintain this action that he prove his chain of title against the defendants' claiming under a separate title. (*Wakeman* v. *Norton,* 24 Colo. 192 [49 P. 283, 18 Morr. Min. Rep. 698] ; c.f. *Schwartz* v. *Arata,* 45 Cal.App. 596, 599-600 [188 P. 313].) As the Supreme Court of this state held in *Weimer* v. *Lowery, supra,* 11 Cal. 104, 112: ''It has never been held that a trespasser upon lands in the possession of another can justify his acts by setting up an outstanding title, in which he has no privity.'' Since the defendant Jarco group failed to establish their own title in privity with a common source of title, plaintiff was not bound to establish the validity of his leasehold interest.

Since plaintiff had sufficient standing to maintain the action in question, all other elements of the cause of action

being satisfied, the next issue presented by this appeal pertains to the nature and extent of the damages which plaintiff should recover by this action. Defendants, in their joint brief, contend plaintiff, as found by the trial court, did not suffer any damage by reason of defendants' trespass or in the alternative that since respondents' mining activity was conducted in good faith and the costs of mining exceeded the price for which the ore was sold, plaintiff did not suffer any damage by reason of the acts of the defendants, citing *Daly* v. *Smith*, 220 Cal.App.2d 592, 602 [33 Cal.Rptr. 920]. They urge in conclusion that plaintiff is not entitled to punitive damages for the trespass or conversion of ore under the rule of *Wolfsen* v. *Hathaway*, 32 Cal.2d 632, 650-651 [198 P.2d 1]; and in any event defendant Portland Cement should not be held liable for such damages since it neither had actual or constructive notice of plaintiff's claim to the property in question.

■ ■ With respect to the measure of damages for the production of minerals in trespass, there is a "mild" rule and alternately the "harsh" rule. (Schwinn, *Tort Liability Resulting from Mining Operations*, (1962) 8 Rocky Mt. Mineral L. Institute, 461, 475.) The former rule is applied when the trespass was by honest mistake and inadvertent, as opposed to being intentional and in bad faith with knowledge of plaintiff's rights. (Morrison's Mining Rights, [16th ed. 1936] p. 456.) Under this "mild" rule, the measure of damages is the value of the ore extracted less the costs incurred by the defendants in the mining, transportation, and smelting of the converted ore, *Benson Min. & Smelting Co.* v. *Alta Min. & Smelting Co.*, 145 U.S. 428, 434 [36 L.Ed. 762, 765, 12 S.Ct. 877, 879]; *Lightner Min. Co.* v. *Lane, supra*, 161 Cal. 679, 704; *Waters* v. *Stevenson*, 13 Nev. 157 [29 Am.Rep. 293, 10 Morr.Min.Rep. 240]; *Hall* v. *Abraham*, 44 Ore. 477 [75 P. 882], since this constitutes the value of the ore in place. (*United States* v. *Wyoming*, 331 U.S. 440 [91 L.Ed. 1590, 67 S.Ct. 1319], reh.den. 332 U.S. 787 [92 L.Ed. 370, 68 S.Ct. 37]; *Mexican Gulf Oil Co.* v. *Compania Transcontinental De Petroleo S.A.* [S.D.N.Y. 1922] 281 F. 148, 165, affd. 292 F. 846; *Empire Gold Min. Co.* v. *Bonanza Gold Min. Co.*, 67 Cal. 406, 409 [7 P. 810]; *Liberty Bell Gold Min. Co.* v. *Moorhead Min. & Milling Co.*, 58 Colo. 308 [145 P. 686].)

Alternately the "harsh" rule is applicable when the trespass is wilful or in bad faith. (*United States* v. *Wyoming, supra*; *Lightner Min. Co.* v. *Lane. supra*; *Rieckhoff* v. *Consolidated Gas Co.*, 123 Mont. 555 [217 P.2d 1076]; *Alvarado*

*Min. & Milling Co.* v. *Warnock,* 25 N.M. 694 [187 P. 542].) Where these circumstances pertain the measure of damages consists of the net value of the ore converted without deduction for defendant's cost of mining, transportation, and smelting. (*Lightner Min. Co.* v. *Lane, supra*; *Alvarado Min. & Milling Co.* v. *Warnock, supra.*)

Defendants urge their possession and mining of the claims in question were in good faith; that the codefendants comprising the Jarco group entered into possession under color of title; that when the Jarco group had actual knowledge of plaintiff's claim they consulted an attorney and in reliance on his advice commenced their mining operations; and that defendant Portland Cement did not have actual or constructive knowledge of plaintiff's claim of right to the Monarch Claims.

According to Mr. Justice Vinson in *United States* v. *Wyoming, supra,* 331 U.S. 440, 458 [91 L.Ed. 1590, 1600, 67 S.Ct. 1319, 1328-1329], "good faith," required for application of the "mild" measure of damages, "contemplated by these rules is something more than the trespasser's assertion of a colorable claim to the converted minerals."

Nevertheless the Jarco group's claim of good faith in the mining of the ore must be considered in view of the other factual aspects. ■ Generally such a taking of minerals is presumed to be wilful and intentional and the defendant bears the burden of proof as to his good faith. (*Elkhorn-Hazard Coal Co.* v. *Kentucky River Coal Corp.* [6th Cir. 1927] 20 F.2d 67, 71; *Liberty Bell Gold Min. Co.* v. *Smuggler-Union Min. Co.* (8th Cir. 1913) 203 F. 795, 802, cert.den. 231 U.S. 747 [58 L.Ed. 464, 34 S.Ct. 320]; *Griffith* v. *Clark Mfg. Co.,* 212 Ky. 498 [279 S.W. 971, 972].)

The fact the Jarco group had constructive notice of plaintiff's claim through his recorded option to lease does not demonstrate the Jarco group's bad faith as a matter of law, *Guffey* v. *Smith,* 237 U.S. 101, 118 [59 L.Ed. 856, 865-866, 35 S.Ct. 526, 531], but the fact remains that they admittedly had actual knowledge of plaintiff's claim through attendance in the trial of the ejectment action (*Whittaker* v. *Otto, supra*) and otherwise in January or February 1959 long before they commenced mining operations in October of that year.

■ The Jarco group counters the seeming effect of this actual knowledge by alleging and proving that they entered into the mining operations only on the advice of counsel, thus their activities after knowledge of plaintiff's claim were still entered into in good faith. " 'It was for the jury to determine

whether or not the defendants acted in good faith.' " (*Daly v. Smith, supra,* 220 Cal.App.2d 592, 599; quoting *Ehrhart* v. *Bowling,* 36 Cal.App.2d 503, 511 [97 P.2d 1010].) After defendants had offered proof of their submission of the question to an attorney before undertaking mining operations, it was well within the province of the trier of fact to conclude the Jarco group acted in good faith. (*Delta Drilling Co.* v. *Arnett* (6th Cir. 1950) 186 F.2d 481, 486; *United States* v. *Homestake Min. Co.* (8th Cir. 1902) 117 F. 481, 484-485; *Mason* v. *United States,* 260 U.S. 545, 555 [67 L.Ed. 396, 400, 43 S.Ct. 200, 202-203], affd. 269 U.S. 125 [70 L.Ed. 195, 46 S.Ct. 52]; *Swiss Oil Corp.* v. *Hupp,* 253 Ky. 552 [69 S.W.2d 1037, 1041-1042]; *Robinson* v. *Gordon Oil Co.,* 266 Mich. 65 [253 N.W. 218, 220]; *Cooke* v. *Gulf Refining Co.,* 135 La. 609 [65 So. 758, 761].)

The judgment of the trial court that plaintiff take nothing by his action cannot be upheld as against the codefendants comprising the Jarco group since "[f]or every trespass upon real property the law presumes nominal damages." (*Empire Gold Min. Co.* v. *Bonanza Gold Mining Co., supra,* 67 Cal. 406, 408-409.) Since there are no express findings, upon retrial of this cause, it will be incumbent upon the trial court to first determine the reasonable market value of 5,038.3 short tons of the quality iron ore converted from the Monarch Claims; then deduct from the sum thus derived the direct expenses of the Jarco group allocable to the production of converted ore sold to Portland Cement, including the direct cost of mining; milling; freight; development expenses, if actually beneficial to the mining property; equipment, maintenance and operation, including supplies, tools, etc., actually used in the mining of this particular ore and remaining on the lease; and costs of the shutdown of defendants' mining operation at plaintiff's request (Schwinn, *Tort Liability Resulting from Mining Operations,* (1962) 8 Rocky Mt. Mineral L. Institute, *supra,* pp. 483-484); and render judgment for plaintiff for the difference of these two sums, if any, plus legal interest on the net reasonable market value of the converted iron ore as thus determined. (Civ. Code, § 3336.) Should the expense of production thus determined exceed the reasonable value of the ore converted, this loss must be borne by the defendants. (*Lawrence Oil Corp.* v. *Metcalfe,* 266 Ky. 819 [100 S.W.2d 217, 223].)

As to the ore buyer, defendant Portland Cement, "where personal property is produced from real, by the labor of a party in possession with claim and color of title, it becomes

marketable without regard to the ultimate decision on the question of who was the owner of the realty." (Morrison's Mining Rights [16th ed. 1936] p. 443; *Page v. Fowler*, 28 Cal. 605, 610, affd. *Page v. Fowler*, 37 Cal. 100; *Halleck v. Mixer*, 16 Cal. 574, 578-579; *Smith v. Idaho Quartz Min. Co.*, 2 Cal. Unrep. 681, 11 P. 878; *Lehigh Zinc & Iron Co. v. New Jersey Zinc & Iron Co.*, 55 N.J.L. 350 [26 A. 920, 922, 17 Morr.Min. Rep. 600] affd. 59 N.J.L. 189 [35 A. 915].)

It is equally apparent that the iron ores in question, once severed from their natural deposit, became personal property. (*South Utah Mines & Smelters v. Beaver County*, 262 U.S. 325 [67 L.Ed. 1004, 43 S.Ct. 577]; *Atlas Milling Co. v. Jones* (10th Cir. 1940) 115 F.2d 61, 63.) As a general proposition in the circumstance in which personal property is produced from real, by the labor of a party in possession under claim of right, it becomes marketable without reference to the ultimate decision on the question of ownership. (*Smith v. Idaho Quartz Min. Co., supra*, 2 Cal.Unrep. 681, 11 P. 878; *Giffin v. Southwest Pennsylvania Pipe Lines*, 172 Pa. 580 [33 A. 578, 580]; *Lehigh Zinc & Iron Co. v. New Jersey Zinc & Iron Co., supra*, 55 N.J.L. 350 [26 A. 920, 17 Morr.Min.Rep. 600]; c.f. *Halleck v. Mixer, supra*, 16 Cal. 574, 578-579).

The trial court found upon substantial evidence that defendant Portland Cement had no actual notice of the ownership dispute. In accord with the law this finding will not be disturbed on appeal. (*Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689]; *Berniker v. Berniker*, 30 Cal.2d 439 [182 P.2d 557].) Under the facts of this case at bench, defendant Portland Cement upon receipt of the ore for processing or at the time of paying for it was under no legal obligation to question the ownership of the ore. To hold otherwise would require the processor in all cases to have produced to it a prior judicial determination of ownership.

The appeal from the order denying the motion for new trial is dismissed. The judgment in favor of defendant Portland Cement is affirmed. The judgment in favor of the Jarco group and Jarco Mining, Inc. is reversed and remanded for further proceedings in accordance with this opinion.

Kerrigan, J., and Tamura, J., concurred.

A petition for a rehearing was denied March 13, 1967, and the opinion was modified to read as printed above. The petition of the appellant and of the respondents (except respondent cement company) for a hearing by the Supreme Court were denied April 19, 1967.