[Civ. No. 25819.   First Dist., Div. Four.   July 28, 1969.]

THOMAS L. BESS et al., Plaintiffs and Appellants, v. ELSIE
WISE et al., Defendants and Appellants.

Huber & Goodwin and Norman C. Cissna for Plaintiffs and Appellants.

Mahan, Dunn, Harland & Gromala and John A. Gromala for Defendants and Appellants.

RATTIGAN, J.—The tenants of land brought this action against the owners and lessors thereof, seeking declaratory relief relative to a sum of money collected by defendants from third parties after the land had been inundated in a flood. After a nonjury trial the court entered a judgment allocating two-thirds of the money to plaintiffs, one-third to defendants. Both groups appeal, each from that portion of the judgment which awarded money to the other.

The evidence generally showed as follows: At all relevant times defendants owned the John Hansen Ranch, which lies along the Eel River in Humboldt County. In 1963, they leased a portion of it to plaintiffs for use as a dairy ranch. The written lease describes the leased premises as "a portion . . . of the John Hansen Ranch . . . described as . . . That real property situated west and south of the railroad track to the edge or beginning of the riverbar . . ." It further states that

"This lease does not cover nor include . . . the riverbar, . . . [nor] . . . logs and timber thereon due to flooding of the Eel River . . . nor . . . the subsurface estate of said JOHN HANSEN RANCH . . ."

Paragraph 1 of the lease provides for plaintiffs' payment of rent according to a schedule of their dairy production on the leased premises. As pertinent, paragraph 7 states: "In the event of a catastrophe of the same proportions as the 1955 flood in Humboldt County, there will be a moratorium on all payments for a period of one (1) year from the date of said catastrophe, all of said payments to be waived by . . . [defendants] . . . or, at the option of . . . [plaintiffs, they] . . . may declare the lease terminated with no further liability thereunder . . ."

In paragraph 4 defendants, as lessors, agreed "to furnish the necessary materials to keep the outside . . . fences in good repair." Paragraph 5 obligated them to repair buildings on the leased premises to the extent that "extensive repairs" thereto were necessary "following damage by the elements (forces of nature) [sic] or by an unavoidable accident." In paragraph 8 plaintiffs, as lessees, agreed to permit defendants or their agents "to enter onto the dairy ranch at any reasonable time for inspection." In paragraph 15, plaintiffs agreed that the parties to any oil and gas lease executed to the "subsurface estate" by defendants "may enter upon the demised premises" and conduct therein activities associated with oil and gas production.

While plaintiffs were in possession of the leased premises in 1964, the Eel River overflowed under extreme flood conditions. The floodwaters covered the leased premises and the John Hansen Ranch generally, and swept large quantities of logs and wood debris upon both. The logs, which had been washed on the flood from upriver locations, damaged some of the improvements on the leased premises. Many of them were stranded when the floodwaters receded. Some were marked, and were thus identifiable as the property of various logging and lumber firms (hereinafter the "lumber companies"). Others were of unknown ownership.

Some of the stranded logs were lodged on a hayfield which was cultivated by plaintiffs and which, the parties agree, was part of the leased premises. The others were left in an area of unimproved bottomland which lay between the hayfield and the normal channel of the river. The bottomland was partially overgrown by willows and was not cultivated. Concerning the

extent to which it was "riverbar" (one of the subjects in dispute in this action), the trial court heard conflicting testimony from several witnesses.

Plaintiffs elected to and did remain in possession of the leased premises after the flood, and received the one-year rental moratorium permitted them in paragraph 7 of the lease. Pursuant to paragraph 5 thereof, defendants spent approximately $900 to repair log damage to a feed barn on the leased premises. It also appears that, pursuant to paragraph 5 of the lease, they provided materials to repair fences damaged by floating logs; this was not clearly shown, and the amount of their expenditure for this purpose was not proved. The hayfield was extensively damaged, principally by heavy equipment used in the log-removal operation hereinafter mentioned. There was no evidence that any damage was caused by floating logs, or by the removal of stranded logs, on the bottomland area between the hayfield and the normal river channel. Plaintiffs received approximately $5,000 in flood-assistance payments, from the federal government, for their expenses in clearing and rehabilitating the leased premises.

Plaintiffs intended to claim all the logs which were stranded on the hayfield and on the adjacent bottomland, but defendants informed them that their lease would be terminated if they did so. Thereafter defendants unilaterally negotiated with the lumber companies concerning (1) the payment of damages caused on the John Hansen Ranch by the lumber companies' logs, and (2) the lumber companies' purchase of the unmarked logs stranded there. In consequence, the lumber companies paid defendants $10,819.51 for log damage and $7,538.21 as the purchase price of unmarked logs. With defendants' consent (but not plaintiffs'), the lumber companies subsequently entered the hayfield and the adjacent bottomland, and removed stranded logs from both areas; it was during this activity that the soil in the hayfield was damaged by compaction.

Although the details of defendants' transaction with the lumber companies were not shown in the evidence, the two amounts paid to defendants, and the respective purposes thereof, are not disputed. It is also undisputed that the log-damage payment was made pursuant to Public Resources Code section 4702.[1] The parties stipulated at pretrial confer-

---

[1]As effective in this case (i.e., as it read prior to its repeal and re-enactment as section 4852 in 1965 [Stats. 1965, ch. 1144, § 9.4, p. 2828; ibid., § 9.6, p. 2875]), section 4702 provided as follows: "Whenever any

ence that defendants received and held the full $18,357.72 "in trust."

Upon this evidence, and as pertinent here, the trial court made the following findings of fact: ". . . 3. Defendants received and accepted as sums payable from the owners of certain logs . . . the sum of $10,819.51 as and for damages as to the Plaintiffs and Defendants as occupants and owners of the property by reason of the logs and lumber coming upon the land and from its removal. 4. Defendants received and accepted as sums due from the sale of other non-identifiable logs the sum of $7,538.21. 5. It is not necessary to determine the total amount of damages suffered by the Plaintiffs or Defendants from the logs . . . coming upon the respective premises or the damages suffered by the Plaintiffs or Defendants from the removal of the logs . . . in order to divide the sums the Defendants accepted therefor. 6. Two-thirds of the logs were deposited on leasehold property, and one-third on river bar property excluded from the lease. 7. River bar, as used in the lease, means . . . [that portion of the John Hansen Ranch] . . . covered by willows surrounding the exterior of the ranch proper. 8. Two-thirds of the non-identifiable logs which were sold for . . . $7,538.21 by Defendants were on the leasehold property, and the other one-third was on the river bar property. 9. Plaintiffs' receipt of free rent for one year following the flood is separate and apart from any rights to damages from the logs . . . or their removal or any rights to sums from the sale of other logs on the leased premises. . . ."

Under "conclusions of law" the trial court stated ". . . 3. That the Plaintiffs have and receive from the Defendants two-thirds of the sum of $18,357.72, to wit: the sum of $12,238.48, on account of damages to leasehold sustained from logs . . . coming upon the property and from the removal thereof. 4. That the Defendants retain one-third of the sum of $18,357.72, to wit: the sum of $6,112.29, on account of logs deposited on non-leased premises." The judgment states in paragraph 1 (the only portion thereof which is involved on the appeals) as follows: "1. That Plaintiffs have and recover

lumber drifts upon any island in any of the waters of this State, or upon the bank of any such waters, the owner of the lumber may remove it on payment or tendering to the owner or occupant of the land the amount of the damages which he has sustained by reason thereof, and which may accrue in its removal."

As used in section 4702, the term "lumber" includes logs. (See Pub. Resources Code, § 4701 [as it also read prior to statutory revision in 1965].)

from Defendants the sum of $12,238.48 plus interest earned on said sum while held in trust during litigation. The balance of said trust fund is to be retained by defendants."

The money allocation made in the judgment was derived from the trial court's conclusions of law (numbered 3 and 4) that plaintiffs were entitled to two-thirds of the trust fund, defendants one-third. Those conclusions, in turn, were unmistakably based upon the court's finding (No. 8) that "Two-thirds of the non-identifiable logs which were sold for the total sum of $7,538.21 by Defendants were on the leasehold property, and the other one-third was on the river bar property." The judgment thus allocated *all* of the money on the basis of where *some* of the logs (the non-identifiable category) were stranded.[2] Making the allocation, the trial court failed to consider the difference between the $10,819.51 and the $7,538.21. Because separate rules apply to each sum, the allocation was erroneous; this requires reversal of the judgment for re-examination of some—but, as hereinafter discussed, not all—of the issues.

■ We first consider the $10,819.51 collected by defendants, pursuant to Public Resources Code section 4702 (see fn. 1, *ante*), as damages caused by floodborne logs. Plaintiffs and defendants both contend that some allocation of this money between them is required, depending upon log damage caused to the fee and to the leasehold respectively. We disagree: as we interpret section 4702 under the circumstances of the present case, only plaintiffs—as lessees in possession of the damaged land—were entitled to the $10,819.51, and the statute does not require the allocation of any portion thereof to defendants.

■ Section 4702 does not directly indemnify the owner or occupant of riparian land against damage from floating logs, nor does it absolutely require the owner of the logs to pay such damages. It *permits* the owner of the logs to recover them from the land upon payment or tender of the damages to the "owner or occupant" thereof. Since it thus grants the owner of the logs a *right of entry* upon condition that the damages be paid or tendered, it follows that the persons entitled to the payment or tender—as between "owners" and

---

[2]This basis for the allocation is expressly indicated in the trial court's written opinion, which we have considered "to discover the process by which he arrived at his decision, and to determine whether in doing so he applied correct rules of law." (*People* v. *Miles & Sons Trucking Service, Inc.* (1968) 257 Cal.App.2d 697, 700 [65 Cal.Rptr. 465].)

"occupants"—are the persons whose possession will be disturbed by the entry and who are entitled to permit it, or to forbid it, or to treat it as a trespass in the absence of a statute conditionally granting it.

So far as the evidence shows (and this is not disputed on either appeal), plaintiffs alone were in possession of the Bess premises when the flood occurred. The lease gave them the right of possession to the exclusion of defendants (Civ. Code, § 1925; *Yee Chuck* v. *Board of Trustees* (1960) 179 Cal.App.2d 405, 410 [3 Cal.Rptr. 825]), and their exclusive possession was not qualified by the limited rights of entry granted to defendants or to their subsurface lessees under paragraphs 8 or 15 of the lease. Only plaintiffs' possession could have been—and was—disturbed by the lumber companies' entry to remove logs. Plaintiffs alone were entitled to treat the entry as a trespass and to take action against it (*Brown Derby Hollywood Corp.* v. *Hatton* (1964) 61 Cal.2d 855, 858 [40 Cal.Rptr. 848, 395 P.2d 896]); defendants were not so entitled (*Whittaker* v. *Otto* (1967) 248 Cal.App.2d 666, 672-673 [56 Cal.Rptr. 836]; see *Heilbron* v. *Kings River etc. Canal Co.* (1888) 76 Cal. 11, 16 [17 P. 933]), and they (defendants) had no right to permit the entry. (*Brown Derby Hollywood Corp.* v. *Hatton, supra.*) Since plaintiffs alone could have permitted the entry, they alone are entitled to the log-damage payment.

Plaintiffs' entitlement to the full $10,819.51, moreover, is not affected by other matters shown in evidence at the trial. The dollar amount of actual damages caused by logs on the Bess premises, and whether it was mitigated to any extent by the federal government's flood-assistance payments, were—or should have been—factors in the negotiations conducted by defendants, as plaintiffs' trustees, with the lumber companies (which factors might have been taken into account if defendants had included plaintiffs in the negotiations). No basis appears, either, for allocation of any of the $10,819.51 to defendants for log damage on the unleased portion of the John Hansen Ranch (including the "river bar"): the evidence shows none.

At this point we could modify the judgment—as to the $10,819.51—to provide that plaintiffs receive all of it. However, we perceive the possibility that defendants are entitled to claim an offset upon a theory not yet discussed. They showed that they paid for materials used in fence repair and for restoration of the feed barn (pursuant to paragraphs 3

and 5 of the lease, respectively). The damage in each instance was apparently caused by floodborne logs. Defendants could be entitled to reimbursement, from the $10,819.51, for expenditures of this nature: not because they had a direct right to allocation of any part of the money, but because they are subrogated to part of plaintiffs' right to receive all of it. (Civ. Code, §§ 2848, 2849; *Randall* v. *Duff* (1895) 107 Cal. 33, 35 [40 P. 20]; *Meyer Koulish Co.* v. *Cannon* (1963) 213 Cal. App.2d 419, 423-425 [28 Cal.Rptr. 757]; Rest., Restitution, § 162.)

Defendants did not assert a subrogated right below, and they have argued none on the appeal. ■■ The doctrine of subrogation, however, is "liberally applied to promote justice" (*Meyer Koulish Co.* v. *Cannon, supra,* 213 Cal.App. 2d 419 at p. 424), and we think that final equity between the parties requires its consideration in the present case. The trial court did not consider it, and the evidence of defendants' expenditures for the repair of actual log damage on the leased premises, pursuant to their obligations under the lease, is not entirely clear. Accordingly, the trial court should determine whether defendants have any subrogated rights to the $10,819.51 as discussed herein and, if so, the extent thereof in terms of money, determined upon precise evidence. At least a partial reversal is therefore required.

■■ We reach a different conclusion as to the $7,538.21 collected by defendants from the sale of unmarked logs. Defendants first contend that plaintiffs' election to remain in possession of the leased premises, and their acceptance of the one-year rental moratorium permitted in paragraph 7 of the lease, precludes them (plaintiffs) from collecting any part of this money. In its finding No. 9, the trial court interpreted paragraph 7 contrary to defendants' position. This interpretation was reached with the aid of extrinsic evidence to the effect that in negotiating the lease plaintiffs requested the rental moratorium, and defendants granted it, in anticipation that a disastrous flood would interrupt plaintiffs' dairy production and subject them to flood-damage expenses. The extrinsic evidence was not in conflict. Although we must independently interpret paragraph 7 for that reason (*Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Coronet Credit Corp.* v. *West Thrift Co.* (1966) 244 Cal.App.2d 631, 641 [53 Cal.Rptr. 433]), we agree with the trial court. Nothing in the lease or in the extrinsic evidence supports the interpretation that plaintiffs' election

to receive the rental moratorium amounted to a waiver of their right to receive the proceeds of sale of logs salvaged from the leased premises.

Because the unmarked logs were of unknown ownership, Public Resources Code section 4702 does not apply to the proceeds of their sale; it pertains only to logs with known owners. The parties' respective rights to the $7,538.21 must therefore be determined in accordance with the law relative to the acquisition of title to floating logs under the circumstances of the present case.

Although there is little authority on this subject, at least one court has held that, where "driftwood"[3] lodges on riparian land, the *owner* of the land acquires at least qualified title to the driftwood, good against everyone except the true owner thereof. (*Yuba Consol. Goldfields* v. *Hilton* (1911) 16 Cal.App. 228, 232 [116 P. 715]. See 93 C.J.S., Waters, § 82, p. 755.) As to the identity of the person or persons who might acquire such title where the riparian land is held under lease, this rule does not distinguish between the owner of the land and a tenant in possession thereof. It appears, however, that the qualified title to the logs derives from their *possession*: the above-cited decision speaks of it as "possessory title" (*Yuba Consol. Goldfields* v. *Hilton, supra*) and holds that, because it may be the subject of a grant, it may be acquired by adverse possession. (*Ibid.*, at pp. 233-234.) Moreover, the qualified title of a person coming into possession of floodborne logs of unknown ownership may be equated with that of a finder of lost property, whose title (also qualified) is essentially *possessory* under common law and statutory rules. (Civ. Code, §§ 1865, 1871, 2080, 2080.5.[4] See *People* v. *Beach* (1944) 62 Cal.App.2d 803, 806 [145 P.2d 685]; 1 Witkin, Summary of Cal. Law (7th ed. 1960) Personal Property, §§ 35-36, pp. 804-805.)

Qualified title to the unmarked logs was thus exclusively acquired by plaintiffs to the extent that the logs came into their possession. This means that they acquired such title to the logs which were stranded on the leased premises, of which their possession was exclusive under the lease. (Civ. Code,

---

[3]The term "driftwood" is applicable to the logs under discussion here. (Cf. Pub. Resources Code, § 4852.)

[4]We refer to the four cited sections as they read prior to their repeal and the enactment of present section 2080 et seq. of the Civil Code. As the statutory revision occurred in 1967 (Stats. 1967, ch. 1512, p. 3601), the former sections apply in the present case. The new ones, in any event, continue to support the conclusion that a finder's title is possessory. (See, e.g., Civ. Code, § 2080.)

§ 1925; *Yee Chuck* v. *Board of Trustees, supra,* 179 Cal.App. 2d 405 at p. 410; *Heilbron* v. *Kings River etc. Canal Co., supra,* 76 Cal. 11 at p. 16.) It means, further, that they are entitled to the money realized from those logs. This required the trial court to delineate the leased premises and to determine the quantity of logs stranded there.

The trial court made these determinations. Finding No. 7 delineated the leased premises by defining the "river bar" excluded therefrom. Read in the context established by all the evidence relevant thereto, finding No. 7 determined that the leased premises did not include the bottomland lying between plaintiffs' hayfield and the normal channel of the Eel River. The finding amounted to the trial court's interpretation of the "river bar" provisions of the lease. Since the interpretation was made with the aid of extrinsic evidence which was in conflict, it will not be disturbed on the appeal. (*Parsons* v. *Bristol Dev. Co., supra,* 62 Cal.2d 861, 865-866; *Coronet Credit Corp.* v. *West Thrift Co.* (1966) 244 Cal.App.2d 631, 641 [53 Cal.Rptr. 433].)

In finding No. 6, the trial court determined that two-thirds of the stranded logs were on the leased premises, one-third on the river bar. This finding was made upon conflicting evidence, some of which supports it. Accordingly, it cannot be successfully challenged on the appeal. (*Crawford* v. *Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Waller* v. *Brooks* (1968) 267 Cal.App.2d 389, 393-394 [72 Cal.Rptr. 228].) It follows that plaintiffs are entitled to receive two-thirds of the $7,538.21 (or $5,025.47), and that the judgment must be affirmed to that extent.

That portion of the judgment from which defendants appeal is affirmed to the extent that it awards plaintiffs the sum of $5,025.47, but is otherwise reversed. That portion of the judgment from which plaintiffs appeal is reversed. No party shall recover costs on appeal.

Devine, P. J., and Christian, J., concurred.