Filed 8/16/16  Panich v. Portnoy CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LEONORA PANICH, | B267586 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC516496) |
| v. | |
| JEFFREY PORTNEY, as Trustee, etc., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Elizabeth Allen White, Judge.  Reversed and remanded.

Tesser Ruttenberg & Grossman, Brian M. Grossman and Nickolas B. Solish for Plaintiff and Appellant.

Sylvester, Oppenheim & Linde, Richard D. Oppenheim, Jr., and David A. Seeley for Defendant and Respondent.

_____

Leonora Panich (Panich) entrusted money to her brother, Joseph Portney (Joseph), to invest on her behalf. She claims Joseph transferred a substantial portion of the money into accounts that he, his wife or his son, Jeffrey Portney (Jeffrey), owned or coowned, and that Joseph never paid her or used the money for her benefit. After Joseph died, Panich sued Jeffrey in his capacity as the trustee of the Joseph and Ina Portney Living Trust, and as trustee of the Survivors Trust under the Joseph and Ina Portney Living Trust (collectively Trust). Panich also sued Jeffrey as the administrator and/or executor of the Estate of Joseph Portney (Estate). By way of various causes of action, Panich attempted to recoup money allegedly taken by Joseph. The trial court entered a judgment in favor of Jeffrey because Joseph did not keep any records, and Panich could not prove that Joseph failed to pay the money back or use it for her benefit. Panich now appeals.

The issue on appeal is whether the trial court erred when it placed the burden on Panich rather than Jeffrey to prove what happened to the money that Joseph withdrew from her bank accounts. The answer is yes. In addition, we conclude this error caused Panich prejudice. Accordingly, we reverse.

## FACTS

### Pleading

After several rounds of pleading, Panich filed a second amended complaint against Jeffrey as trustee of the Trust and administrator/executor of the Estate. She alleged that Joseph agreed to invest and manage over a million dollars that she obtained after selling her residence, and that he took "a substantial amount of those funds." Panich alleged causes of action for elder financial abuse, conversion, breach of fiduciary duty and money had and received.

In his answer, Jeffrey asserted a multitude of affirmative defenses, including laches. He also alleged that the action was equitably barred because Panich and her attorney-in-fact, Sanders Chase (Chase): (1) waited until after Joseph died to sue, and (2) attempted to have Jeffrey investigated or indicted for forgery of Joseph's signature without making an effort to determine whether Jeffrey had authorization from Joseph, or power of attorney from Joseph.

2

**Trial**

*The Joint Accounts*

On September 6, 2005, Panich wrote a check to herself for $1,224,054.39 from a Wells Fargo account and deposited the money into an account at Premier America Credit Union (Premier America). The source of the funds was the sale of her Beverly Hills home. Subsequently, the funds were allocated to multiple joint accounts at Premier America, and those accounts were owned by Panich, Joseph and Ina Portney. The joint accounts included certificate of deposit (CD) accounts, and a money market (MM) account. In 2008, a checking account was opened as an additional joint account.

The joint accounts included:

• CD No. 2 (Panich CD2) for $100,000. It was associated with certificate account No. *5252.

• CD No. 3 (Panich CD3) for $100,000. It was associated with certificate account No. *5252.

• CD No. 5 (Panich CD5) for $80,000. It was associated with certificate account No. *5252.

• MM account No. *52047 (Panich MM account No. *52047).[1]

• Checking account No. *52021 (Panich checking account No. *52021) containing $10,000.

*The Power of Attorney*

On February 20, 2006, Panich signed a uniform statutory power of attorney form granting Joseph the power to act as her agent with respect to financial transactions involving banks and other institutions.

---

[1]     Panich submitted a summary of transactions related to Panich MM account No. *52047. The summary states that the account was funded on September 6, 2005, with $684,054.

3

*Expert Testimony On Behalf Of Panich*

Joseph Pohlot (Pohlot) was retained by Panich as a forensic accounting expert to trace the funds that she deposited into the joint accounts. He was called to testify about his findings.

<u>Panich CD2 and Panich CD3</u>

On September 22, 2008, Premier America issued a receipt stating that Panich CD2, in the amount of $115,857.47, and Panich CD3, in the amount of $115,857.47, were closed. At the same time, Joseph closed his own two CDs, each worth $115,857.47. Those CDs were associated with Premier America account No. *406 (Joseph Premier America account No. *406). Premier America issued check No. 475296 and check No. 475297.

Later, Premier America voided check No. 475296 and check No. 475297. According to Pohlot, on September 22, 2008, Joseph purchased two CDs from Premier America, each for $231,314.94. As documentation, Pohlot referred to bank statements sent to the Joseph Portney Family Retirement Preservation Trust (Joseph Preservation Trust) and the Joseph Portney Family Trust (Joseph Family Trust). The statement for the Joseph Preservation Trust pertained to multiple accounts, including certificate account No. *197 (Joseph CD197), and the statement for the Joseph Family Trust pertained to certificate account No. *205 (Joseph CD205). As of October 31, 2008, each CD had a balance of $232,374.12.

Pohlot concluded that the money from Panich CD2 and Panich CD3 was in either Joseph CD197 or Joseph CD205, but Pohlot could not determine which one.

On December 15, 2009, Premier America issued a cashier's check to Joseph for $30,000. According to Pohlot, the $30,000 came out of either Joseph CD197 or Joseph CD205. The back of the cashier's check indicates that the money was deposited into a Bank of America (BofA) account. In his testimony, Pohlot referred to a BofA statement pertaining to BofA account No. *680 in the name of "Joseph N Portney/Ina M. Portney" (Joseph BofA account No. *680). The statement indicated that on December 16, 2009, $30,000 was deposited into Joseph BofA account No. *680.

4

On June 30, 2011, Premier America issued a statement reflecting a withdrawal of $216,162.29 from Joseph CD197 and a withdrawal of $246,872.29 from Joseph CD205. Each had a zero balance. The differing amounts, according to Pohlot, were due to the $30,000 withdrawal in December 2009.

Pohlot was asked what happened to the proceeds. He stated, "So the two closing withdrawals totaled roughly $460,000. . . . [W]hat we see from there is that these amounts were then subsequently deposited into a Fidelity Investment [(Fidelity)] account owned by [Joseph]."

To lay a foundation, Pohlot referred to a statement for Fidelity account No. *163 (Joseph Fidelity account No. *163) indicating a deposit of $460,704.99 on June 22, 2011. The statement was addressed to "Joseph N Portney/Fam TR U/J & I Portney Liv Tr." Subsequently, Pohlot stated, "[W]e see beginning value as of June 1st of zero dollars. And an addition [of] $460,704.99, which corresponds to the closing withdrawals of the two CDs with Premier America."

From June 2011 to March 2013, Joseph Fidelity account No. *163 increased in value to $572,740.46. Pohlot testified that the increase was due to both capital gains and additional deposits, or a combination of both.

Next, Pohlot testified that the balance in Joseph Fidelity account No. *163 was transferred into a new Fidelity account held in the name of the Joseph and Ina Portney Living Trust. He cited a statement for Joseph Fidelity account No. *163 indicating that all transfers reflected in the statement were between Fidelity accounts, and further indicating a withdrawal of $572,740.46 on March 1, 2013. He cited a statement for Fidelity account No. *242 (Joseph Fidelity account No. *242) reflecting an addition of $572,740.46 on March 1, 2013. That statement then reflected a withdrawal of $301,762.00 on March 15, 2013, a withdrawal of $77,877.95 on March 21, 2013, and a withdrawal of $193,097.49 on March 28, 2015.

Pohlot posited that was money transferred from Joseph Fidelity account No. *242 to an account held in the name of Jeffrey. The supporting documentation was a statement for Fidelity account No. *643 (Jeffrey Fidelity account No. *643), which was held in

Jeffrey's name as an individual. It revealed a zero balance on March 24, 2013, then transfers between Fidelity accounts amounting to $379,573.77 on March 31, 2013, which included a deposit of $193,100.51 on March 28, 2013.

In Pohlot's opinion, the $231,215 from Panich CD2 and Panich CD3 was withdrawn in September 2008 and ultimately deposited into Jeffrey Fidelity account No. *643. In his review of the record, Pohlot did not see any transfer of the $231,215 back to an account in Panich's name.

### Panich MM account No. *52047

When tracing the funds from Panich MM account No. *52047, Pohlot determined that Joseph withdrew $314,525, and then later wrote checks to Panich from a BofA account owned by him, and also opened a CD that he endorsed to Panich. Pohlot concluded that Joseph failed to return $18,441.

Pohlot adverted to various bank statements. A statement for Joseph BofA account No. *680 indicated that on July 29, 2008, $49,000 was credited from one of Panich's Premier America accounts, but the specific account was not identified. A statement for Panich MM account No. *52047 indicated that on October 14, 2008, Premier America issued a cashier's check to Joseph for $250,000, and that amount was withdrawn from the account on the same date. A statement for Joseph BofA account No. *680 showed that there was an October 14, 2008, deposit of $250,000. Regarding a third withdrawal, a statement for Panich MM account No. *52047 established that $15,000 was withdrawn on April 18, 2011. One of the statements for Joseph BofA account No. *680 indicated a $15,000 deposit on April 20, 2011. A statement for Panich MM account No. *52047 reflected withdrawal of $525 on July 5, 2011, and a statement for Joseph BofA account No. *680 indicated a deposit in the same amount on July 7, 2011.

Regarding funds returned to Panich, Pohlot testified that between November 7, 2008, and May 25, 2010, Joseph made payments to Panich totaling $61,000. In support, Pohlot referred to a "pleading," which was Jeffrey's responses to special interrogatories in which he identified 11 checks paid from Joseph BofA account No. *680 to or for Panich's benefit. Per Pohlot, on January 26, 2009, Joseph opened a CD at Imperial

6

Capital Bank in the amount of $230,000. Panich withdrew those proceeds and deposited them into her own account. The proceeds totaled $235,084. Pohlot testified that Joseph should get a credit for $61,000 plus $235,084. Those two amounts added up to $296,084.

Pohlot noted that on October 17, 2005, there was a withdrawal of $300,000 from Panich MM account No. *52047. Then, on November 25, 2005, $300,000 was deposited back into the account. Pohlot treated this withdrawal and subsequent deposit as neither a deficit to Panich nor a credit to Joseph.

Panich CD5

According to Pohlot, Joseph withdrew $60,000 from Panich CD5 and deposited those funds into one of his accounts.

As proof, Pohlot pointed to: (1) an audit statement for Premier America certificate account No. *5252 which stated that on January 31, 2006, there was a withdrawal of $60,000 from Panich CD5, and (2) a statement from Joseph BofA account No. *680 that listed a deposit of $60,000 on the same day.

Panich checking account No. *52021

Per Pohlot, Panich checking account No. *52021 was opened in July 2008 with a $10,000 deposit. He assumed that Joseph was the source of the funds. In 2010, Joseph deposited $249,150 into the account, and then withdrew $259,515. In 2012, $1,000 was transferred into the account from Panich MM account No. *52047. In June 2013, only $567 was left in the account. As a result, Pohlot concluded that there was a $353 deficit with respect to Panich's money.

Total Deficit

According to Pohlot, Joseph never paid back $310,109 he took from the joint accounts, nor did he use it for Panich's benefit.

*Testimony of Chase*

Chase is the son of Panich's sister. He is the nephew of both Panich and Joseph, and the cousin of Jeffrey.

In about January 2012, Panich said she could no longer afford to live in her rented apartment. Chase reviewed her bank statements and became suspicious that money was

7

missing from her accounts. He called Joseph, who spoke to Panich. Because Chase did not think the matter was resolved, he contacted Panich's accountant, Mr. Kavinoky, and spoke to him at length.

*Testimony of Panich*

Panich was born in 1923. She sold her Beverly Hills home for $1.5 million and put the proceeds in "the bank." She allowed Joseph to invest some of her money. When asked why, she stated, "Because he was smarter than me." Prior to 2012, she suspected that he kept some of her money. Her suspicion was based on something Chase told her.

On cross-examination, Panich had difficulty answering various questions regarding the date and season. She said she planned to leave her property to Chase. When asked if she was close to Joseph, she said "[n]o," explaining that "[h]e was not a nice person." She said she did not trust him. On re-cross examination, the defense attorney showed Panich the power of attorney that she signed. She said she would never have signed the power of attorney, and would never have let Joseph invest her money.

*Testimony of Jeffrey*

Jeffrey testified that Joseph died in August 2012, a few hours short of his 85th birthday. From 2005 until a house fire in February 2012, Joseph lived in Tarzana. After his wife died in 2008, Jeffrey moved back into the family home and became Joseph's caretaker.

According to Jeffrey, Joseph explained to him that the purpose of the joint accounts was to give him access in case Panich was incapacitated. "In addition," stated Jeffrey, ". . . it was for FDIC . . . protection, which was limited to [$100,000] in those days. And with a co-name[, the protection was] . . . upped . . . to [$200,000]." Further, Jeffrey stated, "Also, finally, my aunt over the years with my direct knowledge had succumbed to many scams, a multitude of them over the years. And ultimately, my father, and at times myself, would have to come in at the last minute and bail her out, figuratively or literally. And he was concerned that her life savings at the end of her life would fall into this pattern and he didn't want that to happen. That was the third reason to be on the accounts."

8

Defense counsel asked Jeffrey if he knew when, if ever, Joseph's power of attorney over Panich's finances was terminated. Jeffrey said he did not know. At that point, defense counsel showed Jeffrey a document that purported to be an appointment giving Chase power of attorney on April 5, 2010. Jeffrey said that he first learned of the document during discovery.

Prior to the time Joseph suffered a massive stroke in 2012, Jeffrey would help Joseph with his finances "[h]ere and there[.]" When asked what he recalled doing, Jeffrey testified: "These proceedings and the discovery that accompanied it refreshed my memory that during the diversification program of my aunt's sales income from [Premier America] to other institutions there was a $250,000 check drawn to my father that was put in his B of A account. Now I don't specifically recall whether he was shopping too much for CD rates or had a medical issue, but four months after that check was issued to my father and put in his B of A account, I gathered my father and my aunt and took them to [a bank]. And I actually drew the check for $230,000 in their presence for a CD in both of their names, in their presence. And also for which at the time I had power of attorney of my father."

Just prior to Joseph's death, Jeffrey reviewed Joseph's financial records and did not find a ledger detailing the transactions involving Panich's money. All Jeffrey found was "bank statements and such."

*Expert Testimony on Behalf of Jeffrey*

Jack Zuckerman (Zuckerman), a forensic account, testified that he had been retained to review Pohlot's expert opinion to determine whether Pohlot was presenting accurate, complete and reliable information. Zuckerman reviewed various records for Panich and Joseph.

Savings Bonds in Panich's Name

According to Zuckerman, there were various documents he could not review because they were missing. He testified that "certain savings bonds seem to have been missing as well." When asked to identify them, he stated: "One in particular was a savings bond that was purchased in January of 2006. I found a disbursement from an

9

account of $30,000 in 2006, and only two savings bonds with the same date. [¶] I presume there was a third. And this is strictly a presumption based on the fact that it was [$]30,000 charged to the account and only two savings bonds actually presented to me." At that point, defense counsel showed Zuckerman exhibit 110.1 and exhibit 110.2, each of which was a $10,000 United States Savings Bond in the name of Panich. They indicated that they were purchased in December 2005, and were issued on January 25, 2006. Zuckerman once again said he inferred that there was a third bond issued to Panich. He testified that he was "not able to trace the purchase of the two or the three bonds to Leonora Panich's bank accounts, nor was I able to trace it to any of Joseph Portney's bank accounts."

Zuckerman noted that there was a $30,000 debit from Joseph BofA account No. *680 on January 17, 2006. As a follow up, he stated: "That might well have accounted for the purchase of the three treasury bonds."

Defense counsel showed Zuckerman three more United States Savings Bonds, each of them in Panich's name for $10,000. Those three bonds were purchased in June 2007, and issued on June 6, 2007. Zuckerman testified that there was no way to trace funds used to make the purchases.

### $60,000

Defense counsel asked Zuckerman his opinion regarding the transfer of $60,000. He stated: "Well, I saw this bank statement that was referenced to as [Joseph BofA account No. *680] and I noted that Mr. Pohlot had charged defendants with $60,000 that was withdrawn from that bank statement on[,] I believe[,] . . . January 31st, 2006. I noted on that same bank statement that there had been a disbursement for $60,000 a few days later. So there was a deposit that came in on the 31st, but a disbursement that went out a few days later. [¶] And there is no tracing[.] Mr. Pohlot did not provide a tracing nor did he know per his deposition testimony where that [$]60,000 going out of the account was." Zuckerman testified that the $60,000 was "potentially . . . paid to or on behalf of" Panich.

10

<u>$20,894.38</u>

When reviewing the records, Zuckerman found a cashier's check issued to Panich in the amount of $20,894.38. He stated: "The memo [for the check] represents the closing of a time [certificate] of deposit. . . . And I was not able to trace the source of the funds, nor was apparently Mr. Pohlot."

<u>Various Payments</u>

Zuckerman testified that Joseph made various payments, including tax payments, on behalf of Panich, for which Joseph should have received credit. The checks were for: $470; $970; $370; $55; $575; $370; $370; $55; $1,220; $1,220; $362; $1,663; $645.96; $4,000; $4,000; and $84. They were all drawn on accounts owned by Joseph individually or with his wife.

The total of these payments was $16,429.96.

**Request for Statement of Decision**

Panich requested a statement of decision.

**Proposed Statement of Decision; Panich's Request for a Statement of Decision on Specified Issues**

The trial court issued a proposed statement of decision that stated various findings of fact, and which concluded that Panich could not prevail because she did not prove what happened to her money.

In response, Panich submitted a request that the trial court provide a statement of decision regarding 10 different specified issues, including the following: The extent to which the $314,525 of Panich's money that Joseph took from Panich MM account No. *52047 was repaid; a determination as to whether the proceeds from Panich CD2 and CD3 were taken by Joseph; and an identification of the money or benefits Panich received from Joseph.

**Judgment; Statement of Decision**

The trial court entered judgment in favor of Jeffrey. It also issued a statement of decision with findings of fact and legal analysis. The statement of decision stated, inter alia, the following:

11

*Findings of Fact*

Panich CD2 and CD3

"On September 22, 2008, Panich [CD2 and CD3] were closed, together with two $100,000 certificates of deposit belonging to Joseph. With interest, the value of each of these CDs had grown to $115,657. . . . On that same day, Joseph opened two new certificates of deposit at Premier America [Joseph CD197 and Joseph CD205], each under the name of a different Portney family trust, and each in the amount of $231,553.07." Joseph CD197 or Joseph CD205 may have been purchased with Panich's money.

Eventually, Joseph CD197 and CD205 were liquidated and deposited in Joseph Fidelity account No. *163. "At this point it appears that Panich's money may have been [commingled] with Joseph's money."

Panich MM account No. *52047

Between August 2008 and July 2011, Joseph withdrew $314,525 from Panich MM account No. *52047 and deposited the money into BofA accounts owned by Joseph and his wife.

Panich CD5

"On January 31, 2006, principal of $60,000 was withdrawn from CD 5, and deposited into Joseph's Bank of America account that same day."

Panich checking account No. *52021

"As of October 31, 2008, [Panich Checking account No. *52021] shows a balance of $10,000 from Panich's money. In July 2010, Joseph deposited $249,150 of his own money from his IRA accounts into [Panich Checking account No. *52021] and withdrew the same amount in two checks. . . . In 2012, Joseph transferred $1,000 from [Panich MM account No. 52047]."

Payments to Panich or for her benefit

Between November 7, 2008, and May 25, 2010, Joseph made payments to Panich totaling $61,000. Out of his BofA account, Joseph paid Panich's taxes in the amount of

12

$16,429.96. In January 2006, Joseph purchased two savings bonds for Panich worth $10,000 each.

### Chase

The trial court summarized the testimony of Chase, finding him guilty of dissembling on multiple points, and noting he and his wife received $140,757.07 from Panich. At one point, the trial court concluded that "Chase . . . appears to have unduly influenced Panich." It commented that "Chase displayed a remarkable lack of credibility when it came to his professed interest in helping his aunt. Chase instead appeared to be motivated not by concern for his aunt, but by greed at the prospect of an inheritance."

### Conclusion

"Given the lack of complete records and the admitted inability of either accountant to trace the funds, the court cannot conclude from the evidence presented that Joseph took any of Panich's money."

*Legal Analysis*

### Money had and Received

"The essential element of an action for money had and received is the allegation that the defendant had and received the money to and for the use and benefit of plaintiff, that the money was not used for the benefit of the plaintiff[,] and that defendant has not given the money to the plaintiff. . . . Here, it is undisputed that the Joint Accounts were funded with Panich's money and that Joseph exercised control over those accounts; however, it appears that Panich received the money or the benefit of the money in the form of taxes being paid by Joseph, distributions by checks from Joseph and savings bonds. Pohlot's tracing of the funds was admittedly inaccurate due to the lack of complete records."[2]

### Breach of Fiduciary Duty

"While Joseph assumed a fiduciary duty when he opened the Joint Accounts with Panich, it is not clear that that fiduciary duty was breached. The uncontradicted evidence

---

[2]    The trial court did not separately analyze conversion. Given that it would have been duplicative, this is understandable.

13

is that Joseph opened the Joint Accounts so that he could access [Panich's] accounts in the event of her incapacity, and because Joseph was concerned that Panich would fall prey to scam artists, and lose her life's savings in the process. . . . The court is satisfied that Joseph's motives in assuming the duty of a fiduciary were pure, namely, that he wanted to protect Panich and preserve her assets. What is less clear is whether Joseph benefited in any way personally by serving as Panich's fiduciary. Both financial experts conceded that the lack of records prevent them from making a clear assessment and tracing of Panich's funds."

Elder Financial Abuse

"Elder financial abuse occurs when a person [t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [Citation.] A wrongful use is defined as taking, secreting, appropriating, or retaining property in bad faith. Bad faith occurs where the person or entity knew or should have known that the elder had the right to have the property transferred or made readily available to the elder or to his or her representative. [Citation.] Here, there is no evidence of bad faith on the part of Joseph. The court however questions the motives of Panich's nephew Chase who testified that he received $140,757.07 from Panich and who now stands to inherit her estate. [Chase] appears to be behind this litigation and . . . appears to be committing financial elder abuse in his dealings with Panich."

Burden of Proof

"[Panich] has the burden of proof. Even assuming that there is some obligation on [Jeffrey] to disprove the claim of misappropriation, neither expert has established that money was or was not misappropriated.

"Both forensic accountants testified that the financial records available to them did not contain sufficient information to fully explain the transactions between the parties. Pohlot's conclusions about any money allegedly misappropriated are couched in terms of 'Potential Owed by Portney.'

14

"Pohlot conceded that he does not know whether a $60,000 check was written for the benefit of Panich, that he does not know the source of the funds for a $10,000 bond in Panich's name, and that he does not know the source of a $300,000 deposit to a joint account of Panich and Joseph. . . . Any alleged liability of Joseph could potentially be swallowed up by amounts for which the expert does not know the source and which went to Panich's benefit in at least the sum of $311,068. . . .

"Therefore, Panich has not satisfied her burden of proof."

Equitable Considerations

"[Panich] conveniently filed this action after Joseph's death and now seeks to impose the burden of proof on [Jeffrey]. Nonetheless, it is clear from the testimony of Jeffrey that Joseph's care and concern for Panich was sincere in that Joseph had helped Panich on many occasions. Even Panich conceded that she trusted her brother to invest her funds because he was 'smarter' than her. The fact that no ledger could be found detailing the transactions does not equate to an automatic finding that Joseph stole money from Panich.

"The court further finds that the motivating force behind this lawsuit is Chase and that he is the one who stands to gain if this lawsuit were adjudicated in Panich's favor. Chase comes to this court with unclean hands and seeks to obtain equity; however, one who seeks equity must do equity. Chase, as the beneficiary of Panich's estate, who himself has engaged in undue influence to obtain significant monies from Panich, now seeks to deprive his uncle's Estate of assets which should rightfully go to his uncle's beneficiaries."

This timely appeal followed.

## DISCUSSION

### I. Burden of Proof.

Panich argues that the trial court misallocated the burden of proof regarding what happened to the money that she proved that Joseph withdrew from the joint accounts. Jeffrey argues that Panich waived this issue, and that the burden of proof did not shift due to equitable considerations.

15

Whether a particular party bears the burden of proof is a mixed question of law and fact.  A mixed question of law and fact qualifies for independent review.  (*In re Raymond C.* (2008) 45 Cal.4th 303, 306.)

*A.  General Principles.*

"Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."  (Evid. Code, § 500; *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 654 ["Whatever plaintiff is obligated to plead, plaintiff is obligated to prove"].)  This "ordinary rule[] governing allocation of the burden of proof may be disregarded for policy reasons in exceptional circumstances.  [Citations.]"  (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 25; *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1253 ["Courts may alter the normal allocation of the burden of proof based on considerations of fairness and policy"].)  "Fundamental fairness must be the lodestar for [the] analysis.  The California Law Revision Commission comment to Evidence Code section 500 states, 'In determining the incidence of the burden of proof, "the truth is that there is not and cannot be any one general solvent for all cases.  *It is merely a question of policy and fairness* based on experience in the different situations."'  [Citation.]"  (*Adams v. Murakami* (1991) 54 Cal.3d 105, 119–120.)  The comment also states:  """"In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors:  the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact."'  [Citation.]"  (*Galanek v. Wismar* (1999) 68 Cal.App.4th 1417, 1426.)

In line with these principles, common law recognizes that an agent has the burden of proving "'that he paid to the principal or otherwise properly disposed of the money . . . he is proved to have received for the principal.'  [Citations.]"  (*Kennard v. Glick* (1960) 183 Cal.App.2d 246, 251 (*Kennard*).)

16

*B. No Waiver.*

In his brief, Jeffrey avers, "Although the trial court's tentative decision stated that plaintiff had the burden of proof, and at least implicitly stated that it would be inequitable to impose the burden of proof on defendant, plaintiff did nothing to argue the issue to the trial judge. In response to the tentative, Plaintiff made requests for findings on certain issues, but the allocation of burden of proof was not among them. At no time did Plaintiff make a motion for new trial or to set aside the decision pursuant to Code of Civil Procedure sections 657 or 663. For plaintiff to raise that issue only now, on appeal, 'is unfair to the trial judge and to the adverse party[.]'"

Jeffrey's arguments are unavailing. Panich raised the burden of proof issue in her written closing argument, so Jeffrey's claim that she did not argue the issue below is contradicted by the record. Also, Jeffrey cited no law establishing that Panich was required to file a motion for new trial or a motion to set aside in order to argue on appeal that the trial court applied an incorrect burden of proof. Our own research revealed no case law supporting his position. We note that "[a] motion for a new trial is not, generally, a condition precedent to an appeal" (*Schmidt v. Macco Construction Co.* (1953) 119 Cal.App.2d 717, 721), and Code of Civil Procedure section 663 was not intended to affect the remedy offered by appeal (*Patch v. Miller* (1899) 125 Cal. 240, 241; *Alvarado v. Stanton* (1928) 204 Cal. 172, 174 [the proceeding authorized by Code Civ. Proc., § 663 "has no connection with an appeal from a judgment" and "in no manner or degree affects or controls the latter proceeding"]).

Beyond these considerations, *Morris v. Williams* (1967) 67 Cal.2d 733, 760 (*Morris*) offers some guidance. In *Morris*, the plaintiff filed a class action against a state agency and administrator to challenge the various state regulations that eliminated some health services entirely instead of making proportionate reductions in all such services. At the hearing, the trial court said the plaintiff bore the burden of proof as to the feasibility of proportionate reductions. (*Id.* at p. 745, fn. 13.) But when it ruled, the trial court concluded that the defendants did not meet their burden on that issue. The defendants protested that they had been misled, and submitted material that had, in part,

17

been prepared after the hearing. (*Id*. at pp. 746–747, 760.) The trial court stood firm. On appeal, the defendants objected to the trial court's ruling that the burden had shifted, once again arguing that they had been misled. The *Morris* court stated: "We have no doubt that the burden of going forward with the evidence on the issue of nonfeasibility properly belonged to defendants. Although a plaintiff ordinarily has the burden of proving every allegation of the complaint and a defendant of proving any affirmative defense, fairness and policy may sometimes require a different allocation. [Citation.] Where the evidence necessary to establish a fact essential to a claim lies peculiarly within the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence on the issue although it is not the party asserting the claim. [Citations.] Clearly only defendants could explain why they deemed proportionate reductions not feasible, and the burden on this issue was theirs. [¶] Defendants' proper remedy for raising the point now made was by motion to reopen following submission of the cause, supported by affidavit showing good grounds. [Citations.] Having failed to assert error properly below, defendants are precluded from raising the matter at this stage of the proceeding. [Citations.] [¶] Assuming . . . that the contention is properly before us, we are convinced that despite the trial court's unfortunate language, defendants should have known that the burden rested on them." (*Id*. at pp. 760–761.) The court noted that during the trial, both sides "strove conscientiously to provide the [trial court] with all available evidence either through oral testimony or by affidavit and at the conclusion of their efforts both clearly indicated to the [trial court] that it could 'close the hearing.'" (*Id*. at p. 761.) It then stated, "Defendants subsequently submitted material containing additional information and, although not properly in evidence, these exhibits are filed with the record on appeal. We have examined them and we find that the information they contain would in all likelihood have been deemed irrelevant under the test of feasibility set out in this opinion. [¶] In sum, we cannot say that defendants were prejudiced in the presentation of their case." (*Ibid*.)

The first rule of *Morris* is that when the burden of proof shifts to a defendant on an issue, it is by operation of law, and that a defendant is charged with this knowledge. The

18

second rule is that when a defendant claims it was misled by a trial court and for that reason did not meet the burden of proof, the defendant must move to reopen before arguing on appeal its presentation of the case was prejudiced.

As applied here, the first rule of *Morris* indicates that the burden of proof shifted to Jeffrey by operation of law. Thus, for this additional reason, Panich is not barred from arguing the burden of proof on appeal.

Jeffrey might suggest that Panich was required to move to reopen under the second rule of *Morris*. But if anyone had to move to reopen, it would have been Jeffrey because he was a defendant who apparently thought he had a lesser burden (but he was not misled, and he had no reason to move to reopen because he won below). Regarding whether the second rule applies to bar Panich from arguing the burden of proof on appeal, *Morris* is distinguishable. In this case, after trial, a greater burden of proof than required by law was imposed on Panich. This did not prejudice her presentation of the case. Instead, it conferred an improper boon on Jeffrey by lessening his burden of proof. That error could not have been remedied by a motion to reopen by Panich, i.e., such a motion would not have changed the improper lessening of Jeffrey's burden of proof. In contrast, before the hearing in *Morris*, the trial court in *Morris* suggested that the defendant had a lesser burden of proof than was actually required by law, something that could have caused the defendant to put on less evidence than necessary to protect its interests. A motion to reopen could have cured any prejudice by allowing the defendant to fully and properly present its case.

*C. The Burden of Proof Shifted to Jeffrey to Trace Money that Joseph Took From the Joint Accounts.*

Joseph was Panich's agent and therefore had "'a duty of keeping an accurate record of the persons involved, of the dates and amounts of things received, and of payments made.' [Citation.]" (*Kennard*, *supra*, 183 Cal.App.2d at p. 251.) In an action that essentially calls for an accounting—regardless of the name of the cause of action at issue—the following pertains: "'If the principal proves or the agent admits that the agent has come into possession of money or other thing for the principal, the agent has the

19

burden of proving that he has paid it to the principal or disposed of it in accordance with his authority.' [Citation.]" (*Ibid.*)

It is apparent that if Joseph was the defendant below, fundamental fairness would have dictated that Joseph bear the burden of proving that the money he received from the joint accounts was returned or paid for the benefit of Panich according to his authority. But Joseph died. Thus, the question presented here is whether policy still required the burden to shift. It did. Neither the trial court nor Jeffrey cited law indicating that the death of an agent who managed money absolves his or her estate and trust of having to account under the rule of *Kennard* for what happened to the money when the estate and trust are sued for breach of fiduciary duty, conversion, etc. Our independent research has yielded no such case law. As a matter of policy, such a rule would not make sense because it would be unfair to the plaintiff, and it could operate to unjustly enrich the estate and trust.

In its legal analysis, the trial court apparently relied on five factors when declining to shift the burden of proof to Jeffrey: (1) Panich waited until after Joseph died to file her lawsuit; (2) Joseph's care and concern for Panich was sincere; (3) the fact that no ledger could be found detailing the transactions does not equate to an automatic finding that Joseph stole money from Panich; (4) Chase was the person who stood to gain if Panich won the lawsuit; and (5) Chase has unclean hands because he engaged in undue influence over Panich.

We easily conclude that factors 4 and 5 are improper considerations because Panich was the plaintiff in the lawsuit, not Chase. It would be a bizarre twist of logic and policy if we were to hold that Panich bore the burden of proof because she was unduly influenced by Chase, and because he might inherit from Panich. Such a holding would relegate Panich to being a double victim without a remedy: because Panich was being unduly influenced by one family member who stood to profit from the lawsuit, Joseph would be exonerated after the fact for obtaining Panich's money and failing to keep a record. It is telling that neither the trial court nor Jeffrey cited law establishing that

20

Chase's financial interest in the outcome of the lawsuit and his alleged undue influence are grounds to place the burden of proof on Panich.

Moreover, to the degree unclean hands is raised in the affirmative defenses alleging that Chase, as Panich's agent, delayed suing until Joseph died and then unfairly sought to have Jeffrey investigated and indicted for forgery, and assuming Panich can be charged with Chase's conduct, we conclude that those affirmative defenses do not impact our analysis. As recently observed, "'[T]he unclean hands doctrine is not a legal or technical defense to be used as a shield against a particular element of a cause of action. Rather, it is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of his claim. It is available to protect the court from having its powers used to bring about an inequitable result in the litigation before it.' [Citation.]" (*Stine v. Dell'Osso* (2014) 230 Cal.App.4th 834, 844.) Thus, even if unclean hands is a viable defense to a lawsuit, it is not a doctrine that impacts the burden of proof. In addition, the delay in filing suit is at most a laches issue. It cannot be said that delaying the filing of a lawsuit "violates conscience, or good faith, or other equitable standards of conduct" (*Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1110) such that it qualifies as unclean hands. Regarding the allegation that Chase sought to have Jeffrey investigated and indicted, we fail to see how that could trigger an unclean hands defense. The law of the defense is clear: "Only if the misconduct is directly related to the cause at issue can a defendant invoke the doctrine." (*Ibid*.) Any conduct aimed at Jeffrey as an individual had no direct relation to this lawsuit either substantively or temporally; nothing Chase did to Jeffrey just before or after Joseph died in 2012 could have had anything to do with Joseph's management of Panich's money.

Factor 3, while true, was a red herring that the trial court should not have considered when deciding whether the burden shifted. A burden shift would not have resulted in automatic liability for Jeffrey, as the trial court seemed to believe. It would merely have created a rebuttable presumption that Joseph took Panich's money if, and only if, Panich proved he obtained it.

21

Factor 2 is not relevant because even if Joseph's care and concern for Panich was genuine, he breached his fiduciary duty to Panich if, as it appears here, he did not keep an accurate record of his transactions. Also, there is no basis to conclude that the genuineness of his care and concern would make it equitable, fair or consistent with public policy to place the burden of proof on Panich. His care and concern are no excuse for failing to keep an adequate record.

This brings us to factor 1, which implies a laches determination.

As with unclean hands, laches is an equitable defense that it is used to bar relief. (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 248 ["Laches is based on the principle that those who neglect their rights may be barred, in equity, from obtaining relief"].) Laches, therefore, is no basis for a trial court to refuse to recognize a burden shift.[3]

---

[3] "The doctrine of laches may be asserted only in a suit in equity. [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1088.) Citing this rule, Panich argues that laches is inapplicable because all of her causes of action are legal. Jeffrey, on the other hand, argues that laches is applicable to the fiduciary duty cause of action because it is equitable. Neither party provides an analysis.

The distinction between actions at law and suits in equity is not always easy to draw. "Whether a cause of action is in law or equity is determinable from a consideration of the common law as it existed at the time of its adoption by this state, and 'in the light of such modifications thereof as have taken place under our own system' [citations]; depends in large measure upon the mode of relief to be afforded [citations]; is ascertained from the gist of the action as framed by the pleadings and the facts in the case [citations]; but is not fixed by the prayer or the title. [Citations.]" (*Paularena v. Superior Court* (1965) 231 Cal.App.2d 906, 911–912; *Nmsbpcsldhb v. County of Fresno* (2007) 152 Cal.App.4th 954, 958–959 [an action is one in equity if it depends on the application of equitable doctrines].)

We need not determine whether laches can be applied as an equitable bar to the fiduciary duty cause of action. The issue is moot because laches does not affect the shifting of the burden of proof. Also, Jeffrey does not argue that conversion, money had and received and financial elder abuse claims are equitable. Consequently, he does not suggest that laches is applicable to those causes of action. We note that a conversion claim seeking damages is ordinarily defined as a legal action. (*Raedeke v. Gibralter Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671–672.)

22

Jeffrey argues that Panich cannot shift the burden because the evidence established that she received some account records at her mailing address, and that therefore Joseph did not have exclusive control over Panich's money. We fail to see the relevance, if true, of Panich receiving certain account records. What matters is whether Joseph withdrew funds from the joint accounts and then failed to keep a record of the transactions involving Panich's money.

In his final argument, Jeffrey suggests that Panich might have been responsible for a lack of complete records. He states that "[u]ntil it is established that the inadequacy of records can be laid at Joseph's door, [Panich's] 'burden of proof' argument goes nowhere." This argument lacks legal support, and it ignores the rule of *Kennard*. With respect to money that Joseph withdrew from the joint accounts, he had a fiduciary duty to keep an accurate record. Consequently, as matter of law, any inadequacy of the records must be laid at Joseph's door.

## II. Prejudice.

Panich argues that she was prejudiced by the trial court's misallocation of the burden of proof. Jeffrey, on the other hand, contends that there was no prejudice because the trial court found that Joseph paid all the money he obtained from Panich to or for her benefit, there was a fatal flaw in each cause of action having nothing to do with the burden of proof, and Panich's causes of action were otherwise barred by the equitable defenses of laches and unclean hands.

A. *Relevant Law*.

When there is substantial evidence in the record that would support a finding for either a plaintiff or defendant on an issue, a misallocation of the burden of proof on that issue is prejudicial, i.e., it is reasonably probable that the appealing party would have achieved a more favorable result absent the error. (*Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 380 ["When . . . substantial evidence in the record would support either finding, an erroneous burden of proof instruction is prejudicial"]; *Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 398 [finding that an erroneous jury instruction was prejudicial in a case where the evidence presented a close question with

23

"substantial evidence on both sides"]; *Thomas v. Lusk* (1994) 27 Cal.App.4th 1709, 1720 [reversing due to an incorrect instruction that altered the burden of proof in a case where the evidence of causation was inconclusive].)

      B. *The Trial Court Found or Assumed Joseph Withdrew Panich's Money From the Joint Accounts; It Never Concluded that Joseph Returned all the Money to Panich, or Paid it for Her Benefit.*

      The parties dispute what the trial court indicated in the findings of fact of its statement of decision. Panich contends that the trial court found that Joseph withdrew her money, but it never determined that he paid it back or paid it for her benefit. In contrast, Jeffrey contends that the "[t]he trial court found, resolving conflicting evidence, that [Panich] failed to prove that [Joseph] had taken any of her money, and found to the contrary that the money had been paid to her or used for her benefit." (Underlining omitted.) Panich's reading of the statement of decision is correct.

      1. <u>Panich CD2 and CD3</u>.

      The trial court did not find one way or the other whether Joseph withdrew all the money from Panich CD2 and CD3 and deposited it into either Joseph CD197 and CD205, as suggested by Pohlot. However, it noted that Joseph CD197 and CD205 were liquidated and the proceeds were transferred into Joseph Fidelity account No. *163. The trial court then stated: "At this point it appears that Panich's money may have been [commingled] with Joseph's money."

      Though Panich requested a finding as to whether Joseph took the proceeds from Panich CD2 and CD3, the trial court deemed it unnecessary, presumably because it had concluded that Panich failed to prove that Joseph neither paid the money back nor paid it for her benefit. As a result, no findings can be implied. As explained long ago: "That it is the duty of the trial court to make findings on every material issue raised by the pleadings is a well-established principle of law. [Citations.] Moreover, although in the absence of a request for special findings on such material issues, the judgment may be upheld on the basis that findings consistent with the judgment can be implied on such issues from those findings which the trial court actually made, the doctrine of implied

24

findings does not apply where a request for special findings as to these issues is made. [Citations.]" (*Coronet Credit Corp. v. West Thrift Co.* (1966) 244 Cal.App.2d 631, 647 (*Coronet Credit*).)

2. Panich MM account No. *52047.

The trial court found that Joseph withdrew $314,525 from Panich MM account No. *52047.

3. Panich CD5.

The trial court found Joseph withdrew $60,000 from Panich CD5.

4. Panich checking account No. *52021.

The trial court made no particular finding of fact with respect to whether Joseph did or did not take Panich's money from Panich checking account No. *52021.

5. Payments to or for the benefit of Panich.

According to the trial court, Joseph wrote checks to Panich totaling $61,000 and paid her taxes totaling $16,429.96. It also found that Joseph purchased two $10,000 savings bonds for Panich. In other words, the trial court found that Joseph paid $97,429.96 to or for the benefit of Panich.

6. Deficit.

Notably, the trial court found or presumed that Joseph withdrew $231,714.94, $314,525 and $60,000. Added together, the withdrawals or assumed withdrawals totaled $606,239.94. When $97,429.96 is subtracted from that total, it leaves a deficit of $508,809.98. It bears mention that Pohlot gave Joseph more credits than those recognized in the statement of decision. But even when those credits are taken into account, the numbers show a deficit.[4]

---

[4] We recognize that the trial court was confronted with confusing records and many unanswered questions, and that its findings of fact would have sufficed if the burden of proof had been properly placed on Panich. But because Jeffrey had the burden of proof, the findings of fact are incomplete because they do not resolve the deficit that is revealed in the numbers.

C.  *In its Legal Analysis, the Trial Court did not Conclude that Joseph Paid all the Money to or for the Benefit of Panich.*

In the legal analysis of money had and received, the trial court stated that Joseph exercised control over the joint accounts, and then stated that "it appears that Panich received the money or the benefit of the money in the form of taxes being paid by Joseph, distribution by checks from Joseph and savings bonds."  The statement that "it appears" Panich received the money or the benefit of the money is not a conclusion or finding that she did.  This is all the more true because such a conclusion or finding would be inconsistent with the findings that Joseph withdrew Panich's money, and the findings that show he paid only a portion of it to Panich or for her benefit.  Moreover, we cannot imply a finding that Joseph paid all the money to or for Panich's benefit because she requested a finding regarding the money or benefits paid to her, and the trial court then issued a final statement of decision that omitted that requested finding.  (*Coronet Credit*, *supra*, 244 Cal.App.2d at p. 647).)

D.  *The Statement of Decision did not Properly Resolve the Causes of Action.*

With respect to conversion and money had and received, Jeffrey argues that the trial court found against Panich on the ground that Joseph paid all the money to Panich or for her benefit.  But as we have explained, the trial court did not make such a finding.  Indeed, such a finding would not have been required if Panich rather than Jeffrey had to prove what happened to the money.

In its legal analysis of money had and received, the trial court stated that "it appears that Panich received the money or the benefit of the money in the form of taxes being paid by Joseph, distributions by checks from Joseph and savings bonds."  Because the trial court said that "it appears" that Panich received the benefit of all the money Joseph withdrew from her accounts, the trial court never actually found that she received the benefit to which she was entitled.  As a consequence, the trial court did not properly rule in favor of Jeffrey.

The same analysis applies to conversion.

26

Regarding breach of fiduciary duty, Jeffrey states that the trial court found "that plaintiff failed to establish that such duty was breached, and failed to show that defendant had personally benefitted in any way from the fiduciary relationship. Once again, implicit in the factual findings that plaintiff's funds had been paid to her or used [for] her benefit is a finding that there was no breach, no benefit taken by defendant, and no damage to plaintiff."

We cannot agree with Jeffrey. The trial court stated that "it is not clear that [the] fiduciary duty was breached." It also stated that "[w]hat is less clear is whether Joseph benefited in any way personally by serving as Panich's fiduciary. Both financial experts conceded that the lack of records prevent[ed] them from making a clear assessment and tracing of Panich's funds." Again, the trial court declined to make a finding or offer a definitive legal analysis on the ground that the evidence did not show what happened to all the money. Tacitly, it concluded that Panich should lose because she did not meet her burden of proof. As we have repeatedly indicated, Jeffrey had the burden of proof. Thus, the trial court's ruling was error.

As for the financial elder abuse cause of action, we anticipate that Jeffrey would argue that the misallocation of the burden of proof did not impact the trial court's finding that Joseph acted in good faith. However, we conclude that the ruling on financial elder abuse cannot be separated from the other causes of action. If there is a new trial and the finder of fact concludes that Joseph breached his fiduciary duties, then the finder of fact should be permitted to consider Joseph's breaches when determining whether he committed financial elder abuse.

E. *Laches and Unclean Hands*.

According to Jeffrey, Panich's delay in asserting her causes of action until after Joseph died established the affirmative defenses of laches and unclean hands. Delay, as we have already indicated, is a basis for laches but not for unclean hands. Regarding laches, Jeffrey failed to analyze whether fiduciary duty is equitable. And, as we explained in footnote 4, *ante*, the *laches* doctrine does not apply to conversion because it

27

is a legal action. Thus, Jeffrey has not demonstrated that these defenses barred Panich's action.

In any event, the issue of laches is moot. The trial court did not make any express findings regarding laches, nor did it reach the legal conclusion that all of Panich's causes of action were barred by laches. Jeffrey has not argued that we should imply such a legal conclusion, nor has he cited any law suggesting that we can imply a conclusion of law (as opposed to a finding of fact).

Moving on, Jeffrey states, "The court found that plaintiff's attorney-in-fact[, Chase,] was the driving force behind the lawsuit, had unduly influenced plaintiff, and had himself financially abused his elderly aunt. Noting that 'he is the one who stands to gain if this lawsuit were adjudicated in Panich's favor,' the court refused to allow itself to be used as a vehicle for iniquity. . . . The court's findings in this area are sound, and undoubtedly correct." This argument lacks merit. Jeffrey cited no law establishing that a trial court can deny a plaintiff relief on a meritorious claim because that plaintiff was unduly influence to file a lawsuit by a person who stands to benefit if the plaintiff wins that lawsuit. In our independent research, we could not find any law supportive of Jeffrey's position. As we previously discussed, the rule espoused by Jeffrey is antithetical to public policy because it would permit the double victimization of a plaintiff, and it would allow a trial court to excuse the unethical conduct of a defendant due to the unethical conduct of a nonparty to a lawsuit.

F. *Conclusion.*

The result in this case was prejudiced by the trial court's misallocation of the burden of proof with respect to what happened to the money that Joseph withdrew from the joint accounts. Pursuant to *Kennard*, he had a fiduciary duty to keep an accurate record. At trial, anyone standing in his shoes, such as Jeffrey, bore the burden of proving what happened to any money that Panich proved that Joseph withdrew from the joint accounts. Panich was entitled to a judgment for any amounts that Jeffrey could not prove that Joseph paid to her or for her benefit.

28

## III. Chase.

Panich requests that if and when we remand this case for a new trial that we direct the trial court to exclude any evidence of her financial dealings with Chase. We decline the request. Though we have indicated that Chase's alleged undue influence over Panich is not relevant to Jeffrey's equitable defenses, we perceive no authority for telling the trial court what it should not or cannot admit as evidence. Moreover, we cannot discount the possibility that Panich's financial dealings with Chase might be relevant to her overall financial picture, and that her overall financial picture might somehow be relevant to the issue of damages.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial. In connection with the new trial, Jeffrey shall bear the burden of proof regarding what happened to money that Joseph withdrew from Panich's accounts. Panich is entitled to her costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
       ASHMANN-GERST


We concur:


_____, J.
     CHAVEZ


_____, J.
     HOFFSTADT